IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SENSORMATIC ELECTRONICS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 20-760 (MN) |
| | ) |
| GENETEC (USA) INC. and | ) |
| GENETEC INC., | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM ORDER

At Wilmington this 29th day of September 2021:

As announced at the hearing on August 10, 2021, IT IS HEREBY ORDERED that the disputed claim terms of U.S. Patent Nos. 9,463,954 ("the '954 Patent") and 7,307,652 ("the '652 Patent") are construed as follows:

1. "one or more landing matrices that define access to the floors, the access control system providing the landing matrices to the elevator controller" / "one or more landing matrices defining access to floors by one or more elevators" means "data structure(s) provided to an elevator controller that define(s) access to the floors of a building" ('954 Patent, claims 1 & 15)

2. "the landing matrices" shall be given its plain and ordinary meaning ('954 Patent, claims 1, 5, 7, 8, 9, 15, 18 & 20-25)

3. "landing matrix object" does not require construction ('954 Patent, claims 1, 4, 10-13, 15, 17, 24 & 26)

4. "landing matrix application programing interface (API)" does not require construction ('954 Patent, claims 1 & 15)[1]

---

[1] The only dispute over the meaning of the terms "landing matrix object" and "landing matrix application programming interface (API)" from the '954 Patent was whether the terms were indefinite. That is, Plaintiff proposed no construction necessary and Defendants argued the terms were indefinite. The Court found that indefiniteness had not been proven at this stage, leaving no further claim construction dispute for these terms.

      5.      "detecting moving objects [within said / in the] selected monitoring area" means "performing detection of moving objects only within/in said selected monitoring area" ('652 Patent, claims 1, 3 & 22)

      6.      Claims 9, 12 and 13 of the '652 Patent are not invalid as indefinite for improperly mixing apparatus and method limitations under *IPXL Holdings*

The parties briefed the issues (*see* D.I. 43) and submitted an appendix containing intrinsic and extrinsic evidence, including expert declarations (*see* D.I. 44). Each side provided a tutorial describing the relevant technology. (*See* D.I. 41 & 42). The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim term, heard oral argument (*see* D.I. 60) and applied the following legal standards in reaching its decision.

## I.    LEGAL STANDARDS

### A.    Claim Construction

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015). "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted). Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Id.* at 1314. "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a

special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."

3

*Phillips*, 415 F.3d at 1318.  Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.*  Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.  Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.  *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

B.  <u>Indefiniteness</u>

Section 112 of the Patent Act requires a patent applicant to "particularly point[] out and distinctly claim[] the subject matter" regarded as the applicant's invention.  35 U.S.C. § 112 ¶ 2.  "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002) (citing *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 28-29 (1997)).  Put another way, "[a] patent holder should know what he owns, and the public should know what he does not." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002).

A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  Definiteness is a question of law, but the Court must sometimes render factual findings based on extrinsic evidence to resolve the ultimate issue of definiteness.  *See, e.g., Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844

4

F.3d 1370, 1376 (Fed. Cir. 2017); *see also Teva*, 135 S. Ct. 842-43. "Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003); *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).

## II. THE COURT'S RULING

The Court's ruling regarding the six disputed claim terms of '954 and '652 Patents was announced from the bench at the conclusion of the hearing as follows:

> . . . At issue we have two patents and [six][2] disputed claim terms.
>
> I am prepared to rule on … the disputes. I will not be issuing a written opinion, but I will issue an order stating my rulings. I want to emphasize before I announce my decisions that although I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state. I have reviewed the patents in dispute. I have also reviewed the portions of the prosecution histories, dictionaries, and expert declarations included in the Joint Appendix. There was full briefing on each of the disputed terms and a technology tutorial submitted by each of the parties. We have also had argument here today. All of that has been carefully considered.
>
> As to my rulings, I am not going to read into the record my understanding of claim construction law and definiteness. I have a legal standard section that I have included in earlier opinions, including recently in *Roche Diabetes Care, Inc. v. Insulet Corp.*, C.A. No. 20-825. I incorporate that law and adopt it into my ruling today and will also set it out in the order that I issue.
>
> The parties have suggested slightly different definitions of the person of ordinary skill in the art for each of the patents, but no party suggests that the differences are relevant to the issues currently before me.
>
> Now the disputed terms.
>
> The first term is actually two terms. First, what I will call term 1A, is "one or more landing matrices that define access to the

---

[2] The parties originally had disputes about ten claim terms. After the hearing, Plaintiff informed the Court that it had withdrawn the claims containing four of the disputed terms (D.I. 64), leaving six disputes.

5

floors, the access control system providing the landing matrices to the elevator controller" in claim 1 of the '954 Patent and second, term 1B, is "one or more landing matrices defining access to floors by one or more elevators" in claim 15 of that patent. Plaintiff argues that the terms require no construction as their meaning is readily apparent to a person of ordinary skill in the art. Today, when pressed on what the ordinary meaning is, Plaintiff offered "data structure(s) provided to an elevator controller that define(s) access to the floors of a building." Defendants mostly agree with Plaintiff but would add that the "data structures" are "proprietary to the elevator vendor" in that definition.

I do not, however, find support in the intrinsic evidence for reading "proprietary" into these terms. The portion of the intrinsic evidence cited to me discusses proprietary mechanisms for configuring and defining the access to the floors but that does not say anything about landing matrices. Therefore, I will construe the terms to mean "data structure(s) provided to an elevator controller that define(s) access to the floors of a building."

The second term is "the landing matrices" in various claims of the '954 Patent. Plaintiff again argues that no construction is necessary, and Defendants argue that the term should be construed to mean "the same one or more landing matrices previously stored by the access control system." I am not entirely sure what the dispute is here. During the hearing, Plaintiff agreed that "the landing matrices" that are overridden in both claims 1 and 15 are the same landing matrices that had been stored on the access control system. And Plaintiff agrees with that because other language in claims 1 and 15 requires it. I agree. And as such I do not believe that Defendants' proposal is necessary or helpful. So I think that the plain meaning is clear from the words themselves.

The third term in dispute is "landing matrix object" in a number of claims of the '954 Patent. The fourth term is "landing matrix application programing interface (API)" in claims 1 and 15 of that patent. The only dispute between the parties on these two terms is whether the term is indefinite. That is, Plaintiff argues that no construction is necessary, and Defendants argue that the terms are indefinite relying on an expert declaration. A finding of indefiniteness requires clear and convincing evidence, which I do not believe exists on the present record. Thus, I decline to reach the merits of Defendants' indefiniteness arguments at this time and Defendants may raise the issue again in connection with summary judgment to the extent that they wish to continue pursuing indefiniteness.

The fifth term is "detecting moving objects [within said / in the] selected monitoring area" from claims 1, 3 and 22 of the '652 Patent. Both sides agree that "detecting" means "performing detection of" and, further, that "the selected monitoring" area is the previously recited "selected monitoring area" in the claims. The dispute here is whether the detection of moving objects must occur only within the selected monitoring area, as Defendants propose, or whether there is no such limitation. In Plaintiff's view, there is no support for limiting the claims to exclude scenarios where detection also occurs outside the selected monitoring area as long as there is also detection in the monitoring area. Defendants, on the other hand, argue that the '652 Patent applicant disclaimed this claim scope during prosecution, effectively limiting the claims to detecting objects only within the selected monitoring area (which is smaller than the full field of view).[3]

I will get to the prosecution history in a moment. I first want to look at the claims and specification. In claims 1 and 3, the terms at issue recite that detecting moving objects occurs either "within said selected monitoring area" or "in the selected monitoring area." To a person of skill, this suggests that the moving objects must be detected in the selected monitoring area that was previously indicated by the user in a prior step. Tracking these claims, there is an embodiment disclosed in the specification where "only objects falling within a predefined area of the camera's 12 field of view are detected." There are also embodiments that are not so limited – *i.e.*, embodiments where the user does not have to indicate a selected monitoring area and instead objects are detected without that limitation. These embodiments seem to track with independent claims other than claims 1 and 3. For example, claim 9 – which does not contain the disputed term – relies on objects meeting previously selected "object qualifying parameters" to detect moving objects. Similarly, claim 12 – which also omits the disputed term – detects moving objects in the whole field of view of the motion video camera. This intrinsic evidence suggests that there are some embodiments where object movement detection is based upon a selected monitoring area that is smaller than the entire field of view. This, in turn, suggests that the "detecting moving objects [within said / in the] selected monitoring area" language is a limitation where moving object detection does only occur in a monitoring area selected previously by a user.[4]

---

[3] (D.I. 58 at 23-24).

[4] (*Id.* at 4:63-67).

7

As I noted, this language was added to the claims during prosecution. The fundamental dispute over this term is whether, in amending the claims to overcome a prior art rejection, the Applicant disavowed claim scope that would cover detection of moving objects outside of the selected monitoring area. Prior to the rejection, the claims at issue only recited "detecting moving objects" without requiring that detection be in "the selected monitoring area." In fact, there was no "selected monitoring area" recited at all in the claims at issue. The Examiner rejected the claims as anticipated over the Crabtree reference, which disclosed detecting moving objects in the camera's field of view. In response, the Applicant amended the claims to recite an additional limitation that required indication of a selected monitoring area within the camera's field of view. Additionally, in that same amendment, the Applicant also amended the detecting limitations to read as "detecting moving objects [within said / in the] selected monitoring area." That is, the claims were amended to require that the detecting of moving objects occur within the selected monitoring area indicated by the user in a previous step. In remarks accompanying that amendment, the Applicant argued that Crabtree did not anticipate the amended claims because it did not "describe or suggest receiving an indication of a selected monitoring area in a field of view of the video frame and detecting moving objects only within the selected monitoring area." In Defendants' view, these amendments and accompanying remarks constitute clear and unmistakable disavowal of claim scope that permits detection of moving objects outside of that selected monitoring area. Plaintiff argues that the point of distinction over Crabtree was the indication of a selected monitoring area, not the detection of moving objects only within said area.

Here, I agree with Defendants. In response to the § 102 rejection, the Applicant amended its claims to recite not only (1) that an indication of a selected monitoring area is required but also (2) that detection of moving objects occurs within that selected monitoring area. Indeed, in explaining the amendment and how it overcame the Crabtree rejection, the Applicant made clear that Crabtree was different than the amended claims because Crabtree did not disclose receiving an indication of a selected monitoring area and because it did not disclose detecting moving objects only within that selected monitoring area. A person of skill viewing the amendments alongside the Applicant's remarks would understand that the invention claimed in the amended claims was different than Crabtree because it involved "detecting moving objects only within the selected monitoring area" previously indicated by the user. To Plaintiff's argument that the point of distinction over Crabtree was the addition of indicating a selected monitoring area, I am unpersuaded. To a person of skill, the addition of that claim element means little in isolation – rather, that indication of a selected

8

monitoring area is tied to the detection of moving objects in that very same area. Moreover, if moving object detection could occur both within and outside of the selected monitoring area, "[within said / in the] selected monitoring area" would no longer have meaning.

Therefore, by adding the step of indicating a selected monitoring area and revising the detecting step to require "detecting moving objects [within said / in the] selected monitoring area" to overcome a prior art rejection, the '652 Patent Applicant disclaimed detection of moving objects outside of that selected monitoring area. A person of skill viewing these amendments and accompanying remarks would understand that the Applicant clearly and unmistakably disavowed claim scope that would cover moving object detection outside of the selected monitoring area indicated by the user in a prior step.

*   *   *

Finally, the [remaining] term is not really a claim term. Instead, it is simply referred to as "claims 9, 12 and 14," all of which Defendants contend are invalid. Each of the three claims is directed to a "computer-readable medium having stored thereon computer-executable instructions" – *i.e.*, these are all apparatus claims. Focusing on the "performing the steps of" limitation in each of the claims, Defendants argue this element is a method step that must be performed to practice the claim. In Defendants' view, under *IPXL Holdings*, the claims improperly mix apparatus and method limitations, rendering it unclear whether infringement turns upon the characteristics of the device or whether a particular use is necessary to practice the claimed invention. Therefore, according to Defendants, the claims are invalid. Plaintiff argues that a person of ordinary skill would understand the "performing" limitation indicates the steps a computer is to perform once the instructions are executed.[5]

Here, I agree with Plaintiff. I think that the reach of *IPXL Holdings* is limited. In that case, the claim at issue was directed to an electronic financial transaction system where one of the limitations provided that "the user uses the input means to either change the predicted transaction information or accept the displayed transaction type and transaction parameters." Although the claim at issue was clearly an apparatus claim, this limitation added a method step, performance of which was necessary to practice the claimed invention. As a result, the mixed nature of the claim rendered it unclear whether infringement arose from the manufacture of the apparatus or from the user's use of the apparatus. These claims are

---

5   (*Id.* at 5:36-39).

9

of a different nature. They all recite a computer-readable medium with instructions stored thereon, and I think a person of ordinary skill would understand that the "performing" limitation indicates the steps that a computer is to perform once it executes the claim instructions. That is, the claims are effectively reciting capability rather than required method steps.

Therefore, I decline to find claims 9, 12 and 13 invalid under *IPXL Holdings* for improperly mixing apparatus and method limitations.

The Honorable Maryellen Noreika
United States District Judge