██████████████████████

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SENSORMATIC ELECTRONICS, LLC, | ) | |
| | ) | C.A. No. 20-760-MN |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | ████████████ |
| GENETEC (USA) INC. and GENETEC INC., | ) | |
| | ) | ████████████ |
| Defendants. | ) | |

**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF PLAINTIFF'S MOTIONS FOR:**

**(1) PARTIAL SUMMARY JUDGMENT OF
INFRINGEMENT OF U.S. PATENT NO. 7,307,652;**

**(2) PARTIAL SUMMARY JUDGMENT OF NO
ANTICIPATION OF U.S. PATENT NO. 7,307,652;**

**(3) PARTIAL SUMMARY JUDGMENT OF NO
INVALIDITY OF U.S. PATENT NO. 7,307,652 UNDER THE
ON-SALE BAR;**

**(4) SUMMARY JUDGMENT OF NO INEQUITABLE
CONDUCT IN SECURING U.S. PATENT NO. 7,307,652**

██████████████████████

## **TABLE OF CONTENTS**

I.     NATURE AND STAGE OF PROCEEDINGS ................................................. 1

II.    SUMMARY JUDGMENT STANDARD ....................................................... 1

III.   MOTION FOR PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT OF
U.S. PATENT NO. 7,307,652 ............................................................... 2

    A.    Overview of Relevant Genetec Products and Asserted '652 Patent Claims........... 2

        1.    Security Center, KiwiVision, Intrusion Detector, Area Protection ............ 2

        2.    '652 Patent – Claims 1, 9, and 10 .............................................. 3

        3.    The Court's Claim Constructions ............................................... 4

    B.    Legal Standards................................................................. 5

    C.    Intrusion Detector: Area Protection Literally Infringes Claims 1, 9, and 10
of the '652 Patent ................................................................ 5

    D.    Genetec (USA) Inc. Directly Infringes Claims 9 and 10 by Offering and
Selling Intrusion Detector and Area Protection in the U.S. ................................ 12

IV.   MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO ANTICIPATION
OF THE ASSERTED CLAIMS OF U.S. PATENT NO. 7,307,652 ............................... 14

    A.    Legal Standards................................................................. 15

    B.    Argument ....................................................................... 15

        1.    Freer does not anticipate the Asserted Claims........................................ 15

        2.    MacCormack does not anticipate the Asserted Claims............................. 17

        3.    Crabtree does not anticipate the Asserted Claims................................... 20

        4.    Ito does not anticipate the Asserted Claims........................................... 23

V.    MOTION FOR PARTIAL SUMMARY JUDGMENT NO INVALIDITY OF
U.S. PATENT NO. 7,307,652 UNDER THE ON-SALE BAR ..................................... 24

    A.    Legal Standards................................................................. 25

    B.    Argument ....................................................................... 27

        1.    No Commercial Offer for Sale: The Primary Purpose of the 1998
Agreements Was Experimentation, Not Commercial Exploitation........... 27

2.      No Evidence that Detecting Only Within a Selected Monitoring
        Area Was Fully Conceived or Ready for Patenting Before March
        10, 1999............................................................................................. 30

VI.    MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT
       IN SECURING U.S. PATENT NO. 7,307,652 ..................................................... 33

       A.      The Prosecution of the '652 Patent.......................................................... 34

       B.      Genetec Cannot Meet Its Burden of Proof on Inequitable Conduct .................... 36

               1.      Mr. Broemmelsiek ..................................................................... 37

               2.      Mr. Cona .................................................................................. 37

               3.      Mr. Sotiriou.............................................................................. 38

VII.   CONCLUSION.......................................................................................... 39

████████████████████████████████

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1st Media, LLC v. Elec. Arts, Inc.*,
   694 F.3d 1367 (Fed. Cir. 2012)................................................................36

*Allen Eng'g Corp. v. Bartell Indus.*,
   299 F.3d 1336 (Fed. Cir. 2002)...........................................................26, 28

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................1

*Barry v. Medtronic, Inc.*,
   914 F.3d 1310 (Fed Cir. 2019)............................................................26, 28

*BASF Corp. v. SNF Holding Co.*,
   955 F.3d 958 (Fed. Cir. 2020)............................................................25, 26

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
   40 F.3d 1223 (Fed. Cir. 1994).................................................................31

*EMC Corp. v. Pure Storage, Inc.*,
   154 F. Supp. 3d 81 (D. Del. 2016).........................................................5, 14

*Foods, LLC v. Hamilton Beach Brands, Inc.*,
   No. 16-41-CFC, 2019 U.S. Dist. LEXIS 65300 (D. Del. Apr. 17, 2019)................28

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
   488 F.3d 982 (Fed. Cir. 2007).................................................................27

*Innovention Toys, LLC v. MGA Entm't, Inc.*,
   637 F.3d 1314 (Fed. Cir. 2011)..................................................................5

*Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*,
   869 F.3d 1336 (Fed. Cir. 2017)............................................................1, 36

*In re Kollar*,
   286 F.3d 1326 (Fed. Cir. 2002)................................................................26

*Linear Tech. Corp. v. Micrel, Inc.*,
   275 F.3d 1040 (Fed. Cir. 2001)................................................................25

*Meds. Co. v. Hospira, Inc.*,
   827 F.3d 1363 (Fed. Cir. 2016)............................................25, 26, 27, 28, 29

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)........................................................................15

*Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    731 F.3d 1239 (Fed. Cir. 2013)........................................................................36

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*,
    695 F.3d 1285 (Fed. Cir. 2012)....................................................................36, 39

*Plumtree Software, Inc. v. Datamize, LLC*,
    473 F.3d 1152 (Fed. Cir. 2006)................................................................26, 27, 29

*Yeager's Fuel v. Pennsylvania Power Light Co.*,
    22 F.3d 1260 (3d Cir. 1994)............................................................................1

**Statutes**

35 U.S.C. § 102(b) ................................................................................25, 27, 33

35 U.S.C. § 271(a) ........................................................................................5

U.C.C. § 2-106 ..........................................................................................25

**Other Authorities**

37 CFR 1.137(b) ...................................................................................33, 35

Fed. R. Civ. P. 56(a) .....................................................................................1

## I.      NATURE AND STAGE OF PROCEEDINGS

Plaintiff Sensormatic Electronics, LLC ("Sensormatic") accuses Defendants Genetec (USA) Inc. and Genetec Inc. of infringing two patents. U.S. Patent No. 7,307,652 ("the '652 Patent") is at issue in Sensormatic's Motions for Summary Judgment. The asserted claims of the '652 Patent recite methods and computer-readable media for detecting and selecting moving objects of interest having predetermined characteristics in a video signal and for reducing information in a video signal by creating data sets based on detected and selected objects of interest. Defendants make, offer, and sell within the U.S. a suite of video analytics solutions for security and video surveillance applications, marketed as KiwiVision Video Analytics. Sensormatic alleges that certain of Defendants' KiwiVision modules and preconfigured analytics "scenarios" are designed to infringe and are used in infringing the claims of the '652 Patent.

## II.     SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' dispute over a material fact exists only if it is 'reasonable' on the summary-judgment record to find that fact, and therefore to reach a verdict, against the movant, taking into account the governing burden of persuasion." *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1343 (Fed. Cir. 2017). If the nonmoving party bears the burden of proof at trial, he "must go beyond the pleadings in order to survive a motion for summary judgment." *Yeager's Fuel v. Pennsylvania Power Light Co.,* 22 F.3d 1260, 1273 (3d Cir. 1994). The non-movant "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

███████████████████████████████

### III.    MOTION FOR PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT OF U.S. PATENT NO. 7,307,652

Sensormatic respectfully requests partial summary judgment that claims 1, 9, and 10 of the '652 Patent have been and continue to be literally infringed by Genetec's KiwiVision Video Analytics suite, specifically by the Intrusion Detector module's Area Protection mode and corresponding predefined "scenario" ("Area Protection"). Sensormatic further requests summary judgment that Defendant Genetec USA directly infringes computer-readable medium claims 9 and 10 by offering and selling Intrusion Detector and Area Protection within the United States.

### A.    Overview of Relevant Genetec Products and Asserted '652 Patent Claims

#### 1.    Security Center, KiwiVision, Intrusion Detector, Area Protection

Security Center is Defendants' flagship product. It is a software-based security platform that "unifies" video surveillance, access control, and automatic license plate recognition systems and allows for integration with third-party systems through plugins. SOF ¶1.[1] Config Tool and Security Desk are desktop applications for administrators and security operators, respectively, to configure and use their Security Center system. SOF ¶2.

KiwiVision is a core module of Security Center that provides intrusion detection, object detection, people counting, and other video analytics and intelligence capabilities. SOF ¶3.

Intrusion Detector is ██████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[1] Unless otherwise noted, citations to "SOF" are to the concise statement of facts filed in support of the motion at issue in the section in which the citation appears.

████████████████████████████████████████

████████████████████████████████████████████████████

SOF ¶4.

Defendants currently market KiwiVision as consisting of four "modules": Security Video Analytics, People Counter, Privacy Protector, and Camera Integrity Monitor. SOF ¶5. Intrusion Detector functionality is provided through the Security Video Analytics module in the form of predefined analytics "scenarios" such as Area Protection. SOF ¶6.

Area Protection is ████████████████████████████ SOF ¶7. Area Protection detects objects moving into a user-definable alarm region based on user-definable parameters such as speed, size, ████████████████ SOF ¶8. ████████████████████████

████████████████████████████████████████████████████

SOF ¶9.

### 2.     '652 Patent – Claims 1, 9, and 10

Independent claims 1 and 9 of the '652 Patent recite a method and a computer-readable medium (CRM), respectively, "for detecting a moving object of interest, having a characteristic with a predetermined value, in a field of view of a motion video camera using a video signal received from the motion video camera." Claims 1 and 9 differ in three ways. First, claim 1 is a method claim, whereas claim 9 is a CRM claim. Second, whereas claim 1 recites "receiving an object qualifying parameter," claim 9 recites "receiving <u>from a user</u> an object qualifying parameter." Third, claim 1 recites "receiving an indication of a selected monitoring area in said field of view" and detecting moving objects "within said selected monitoring area," whereas claim 9 does not. Thus, in claim 9, detecting moving objects may occur anywhere and everywhere within the motion video camera's field of view. The limitations of receiving a selected monitoring area and detecting within it are added in dependent claim 10. *See* D.I. 1-1 at 21-22 (claims 1, 9).

| Claim 1 | Claims 9 |
|---|---|
| **1.** A method for<br><br>detecting a moving object of interest, having a characteristic with a predetermined value, in a field of view of a motion video camera using a video signal received from the motion video camera, said method comprising the steps of: | **9.** A computer readable medium having stored thereon computer-executable instructions for<br><br>detecting a moving object of interest, having a characteristic with a predetermined value, in a field of view of a motion video camera using a video signal received from the motion video camera performing the steps of: |
| receiving an object qualifying parameter representative of the characteristic with the predetermined value of the moving object of interest | receiving from a user an object qualifying parameter representative of the characteristic with the predetermined value of the moving object of interest; |
| receiving an indication of a selected monitoring area in said field of view | |
| detecting moving objects within said selected monitoring area to determine the value of the characteristic of the moving object of interest for each detected moving object; | detecting moving objects to determine the value of the characteristic of the moving object of interest for each detected moving object; |
| determining if a value of the characteristic for each detected moving object is within a predefined tolerance of the predetermined value of the moving object of interest; and | determining if a value of the characteristic for each detected moving object is within a predefined tolerance of the predetermined value of the moving object of interest; and |
| generating an indication of detected moving objects having the value of the characteristic within the predefined tolerance. | generating an indication of detected moving objects having the value of the characteristic with the predefined tolerance. |

### 3.     The Court's Claim Constructions

On September 29, 2021, the Court issued its Claim Construction Order. D.I. 68. The Court construed "detecting moving objects within said selected monitoring area" in claim 1 as "detecting moving objects only within said selected monitoring area," based on amendments and remarks in prosecution that indicated "the Applicant clearly and unmistakably disavowed claim scope that would cover moving object detection outside of the selected monitoring area indicated by the user in a prior step." D.I. 68 at 7-9. The Court did not address whether claim 10 should be similarly construed, because Genetec did not seek construction of claim 10. Nevertheless, Sensormatic does not dispute that the Court's reasoning applies, so the phrase "said step of detecting is performed in

said monitoring area" in claim 10 is properly construed as "said step of detecting is performed only in said monitoring area."

## B. Legal Standards

Direct infringement occurs when one without authority makes, uses, offers to sell, or sells within the U.S., or imports into the U.S., a patented invention. 35 U.S.C. § 271(a). "A determination of infringement involves two steps: First, the court determines the scope and meaning of the asserted patent claims. The court then compares the properly construed claims to the allegedly infringing device to determine whether all of the claim limitations are present, either literally or by a substantial equivalent." *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1318-19 (Fed. Cir. 2011) "This second step is a question of fact." *EMC Corp. v. Pure Storage, Inc*., 154 F. Supp. 3d 81, at 95 (D. Del. 2016). "[A] court may determine infringement on summary judgment 'when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device.'" *Innovention Toys*, 637 F.3d at 1319 (affirming summary judgment of literal infringement).

## C. Intrusion Detector: Area Protection Literally Infringes Claims 1, 9, and 10 of the '652 Patent

Genetec argues that its accused products lack two limitations of claims 1 and 10 and one limitation of claim 9. Specifically, Genetec asserts that its products do not detect "only" within a selected monitoring area (the "'only' limitation"), as the Court construed claims 1 and 10. And it argues that its products do not determine if a value of the characteristic for each detected moving object is within a "predefined tolerance" (the "'predefined tolerance' limitation"), as required by claims 1, 9, and 10. This dispute is illustrated in the table included in Genetec's expert report and reproduced below:



SOF ¶10. Intrusion Detector's Area Protection scenario is designed with and has the capability of satisfying each and every element of CRM claims 9 and 10, and of being used to perform each and every element of method claim 1. SOF ¶¶11-13. For simplicity and to focus the issues, the discussion below is directed to analysis of disputed claim elements.

1.   Claim 9

As shown above, for claim 9, Genetec disputes only that it lacks the "predefined tolerance" limitation. Since this limitation is also present in claims 1 and 10, claim 9 is addressed first.

Intrusion Detector's Area Protection scenario performs the "predefined tolerance" limitation of "determining if a value of the characteristic for each detected moving object is within a predefined tolerance of the predetermined value of the moving object of interest" by determining

██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. SOF ¶¶14-15.

A "predefined tolerance" determines a value range of the "predetermined value." For example, the '652 Patent states: "Detected objects meeting the qualifiers, or falling within the value range of the selected qualifiers (i.e. determined by percentage error an a [sic] predefined tolerance or some other well known comparison technique), are further defined by techniques described below." D.I. 1-1, Ex. D. at 5:6-10. One of the identified parameters is color (*id.* at 5:23; 6:35-42), ████████████████████████████████████████

███. SOF ¶16. Despite the broader use of the term "tolerance" in the specification, ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

SOF ¶17. Regardless of the definition, Genetec's products meet this limitation ████████

████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████. SOF ¶19. This corresponds to a predefined tolerance, even under Dr. Saber's definition of that term. The user setup guide says: ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ SOF ¶18.

████████████████████████████████████████. SOF ¶19.

████████████████████████████████████



Despite this, Genetec claims its products do not meet the "predefined tolerance" limitation because ███████████████████████████████████████████. SOF ¶20. In particular, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ SOF ¶21.

However, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

SOF ¶22. Therefore, Intrusion Detector ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████

Because Intrusion Detector: Area Protection meets the "predefined tolerance" limitation, it infringes claim 9.



### 2.    Claim 1

KiwiVision detects moving objects in a field of view of the camera, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮. SOF ¶23. KiwiVision detects moving objects of interest having characteristics with a

predetermined value, such as the characteristic of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SOF ¶24. Intrusion

Detector's Area Protection mode is designed to be used to perform "receiving an object qualifying

parameter representative of the characteristic with the predetermined value of the moving object

of interest," such as by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮. SOF ¶25.

The '652 Patent explains that "a characteristic and value form an object qualifying

parameter." '652 Patent, 5:5-6. For example, a "number of qualifiers are presented to the user for

selection (i.e. individual qualifiers are selected to be used) and for setting (i.e. values are assigned

to the selected qualifiers)." '652 Patent, 4:65-5:1. "Qualifiers may also include color profile, size,

position, velocity, acceleration, shape, etc." '652 Patent, 22-24.

In the Area Protection scenario, Intrusion Detector receives "an object qualifying

parameter representative of the characteristic with the predetermined value of the moving object

of interest" by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮. SOF ¶26.

Intrusion Detector's Area Protection mode is designed to be used to receive "an indication

of a selected monitoring area in said field of view" by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ SOF ¶27.



Intrusion Detector's Area Protection mode is designed to be used to perform "detecting moving objects [only] within said selected monitoring area to determine the value of the characteristic of the moving object of interest for each detected moving object" because Area Protection, ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ SOF ¶28.

Genetec contends that Area Protection does not detect moving objects "only" within the alarm region because ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ SOF ¶¶29-31. But because KiwiVision ██████████████████████████████████████ ███████████████████████████████████████████████████████████████ KiwiVision's alarm region is a selected monitoring area ██████████████████████. As shown below, the KiwiVision user interface ██████████████████████████████████ ███████████████████████████████████████████████████████████████





SOF ¶32.

SOF ¶33.

Thus, the accused modules perform the "only" limitation. As demonstrated above, the accused modules also perform the "predefined tolerance" limitation. Since Defendants only dispute those two limitations, as it relates to claim 1, the accused modules infringe claim 1.

██████████████████████████████████████

### 3. Claim 10

Defendants only dispute the "only" limitation and the "predefined tolerance" limitation as it relates to claim 10. As shown above, Intrusion Detector's Area Protection mode is designed to and does perform both limitations. It therefore infringes claim 10 for the same reasons as set forth above with regard to claims 1 and 9.

Because there is no genuine dispute of material fact that Intrusion Detector's Area Protection mode is designed to and does enable the performance of methods that literally satisfy claim 1, and it is provided to customers as software that literally embodies CRM claims 9 and 10, the Court should grant summary judgment that Defendants' Intrusion Detector module, through its Area Protection mode, literally infringes claims 1, 9, and 10 of the '652 Patent.

### D. Genetec (USA) Inc. Directly Infringes Claims 9 and 10 by Offering and Selling Intrusion Detector and Area Protection in the U.S.

Genetec (USA) Inc. ("Genetec USA") directly infringes computer-readable medium claims 9 and 10 of the '652 Patent by offering and selling Intrusion Detector and its Area Protection mode in the United States. As shown in the preceding section, Area Protection literally satisfies each and every element of CRM claims 9 and 10 and therefore literally infringe those claims. The undisputed evidence further shows that Genetec USA has sold and continues to sell Area Protection within the U.S. to Defendants' U.S. integrators and end users. Based on Genetec USA's undisputed U.S. sales of the literally infringing Intrusion Detector Area Protection scenario, Sensormatic is entitled to summary judgment that Genetec USA directly infringes claims 9 and 10 of the '652 Patent.

████████████████████████████████████. SOF ¶35.

Genetec USA is a registered Delaware corporation. SOF ¶36. ████████████

████████████████████████████. SOF ¶37.



. SOF ¶35. Defendants' sales teams ████████████████████████████████████████████████████████ SOF ¶38. These include ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ SOF ¶38. Defendants have ████████████████ system integrators in North America. SOF ¶39.

████████████████████████████████████████████████ between October 26, 2016, and January 14, 2022, per the sales information that Defendants have produced in this case.

Genetec USA has sold in the U.S. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ SOF ¶41.

Genetec USA has also sold in the U.S ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. SOF ¶43.

The sales data produced by Defendants, which extends through January 14, 2022, shows that ████████████████████████████████████████████████████

████████████████████████████. SOF ¶44.

████████████████████████████

Based on the foregoing undisputed evidence of Genetec USA's past and ongoing U.S. sales of Intrusion Detector and Area Protection, there is no genuine dispute that Genetec USA has directly infringed and continues to directly infringe at least claims 9 and 10 of the '652 Patent. The Court should grant summary judgment. *See, e.g.*, *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, at *97-100 (D. Del. 2016) (granting summary judgment of direct infringement of method and computer-readable medium claims based on undisputed offers and sales of accused products).

## IV.  MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO ANTICIPATION OF THE ASSERTED CLAIMS OF U.S. PATENT NO. 7,307,652

Genetec contends, via its expert Dr. Saber, that certain prior art references anticipate the asserted claims of the '652 Patent. Specifically, Dr. Saber argues that the Freer, MacCormack, Crabtree, and Ito references each anticipate claims 1-7, 9-11, 13-18, and 25-28, and that MacCormack, Crabtree, and Ito also anticipate claims 8 and 19. Freer is a publication by J.A. Freer *et al.*; MacCormack is PCT Pub. No. WO 98/19450; Crabtree is U.S. Pat. No. 6,263,088; and Ito is U.S. Pat. No. 6,445,409. SOF ¶¶1, 7, 19, 27.

As explained in more detail below, Freer, MacCormack, Crabtree, and Ito all fail to disclose one or more claim limitations of at least claims 1-11, 14, and 18 and, as such, none of these references anticipate any of these claims.[2] The following chart is a summary of the limitations not disclosed in these asserted references along with the claims relevant thereto:

| Relevant Claims | Asserted Reference(s) | Missing Claim Element(s) |
| --- | --- | --- |
| 1-2, 9-11, 14 | Freer, MacCormack, Crabtree | "determining if a value of the characteristic for each detected moving object is within a predefined tolerance of the predetermined value of the moving object of interest" |

---

[2] For efficiency purposes, Sensormatic's analysis explains how certain claim limitations are not disclosed in the four prior art references discussed herein. However, Sensormatic does not concede that claim limitations not addressed herein are disclosed by said references.

| 1-2, 9-11, 14 | Ito | "receiving an object qualifying parameter representative of the characteristic with the predetermined value of the moving object of interest" |
|---|---|---|
| 1-2 | Freer, Crabtree, Ito | "detecting moving objects within said selected monitoring area to determine the value of the characteristic of the moving object of interest for each detected moving object" |
| 3-8, 10 | Freer | "receiving an indication of a selected monitoring area in said field of view" |
| 3-8 | Freer, Crabtree, Ito | "detecting moving objects in the selected monitoring area of the field of view of the motion video camera" |
| 3-8 | Freer, MacCormack, Crabtree | "selecting objects of interest from said detected moving objects" |
| 10, 18 | Freer, Crabtree, Ito | "wherein said step of detecting is performed in said monitoring area" |

### A.     Legal Standards

Anticipation requires that a prior art reference "discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370-71 (Fed. Cir. 2008).

### B.     Argument

#### 1.     Freer does not anticipate the Asserted Claims

Freer discloses an image processing system that identifies moving objects within monochrome video images. SOF ¶2. Freer applies thresholding and binarization to these images to produce an image that contains only two intensity levels – black and white. SOF ¶2. Freer then calculates two measures for each pixel cluster (grouping of connected pixels based on intensity) and those measures are used to detect objects. SOF ¶3. The two calculated measures for each pixel cluster are pixel area and shape factor. *Id.*

███████████████████████████████████████

**a.      Freer does not disclose the "predefined tolerance" limitation**

As explained further below, Freer does not disclose the "predefined tolerance" limitation recited in claims 1, 4, 9 and 14. As a result of this missing limitation, Freer does not anticipate those claims or claims 2, and 10-11 that depend therefrom. The meaning of the "predefined tolerance" limitation is discussed above. Whether the "predefined tolerance" is understood as a deviation or as a range, Freer does not disclose a predefined tolerance.

On the contrary, Freer merely discloses a threshold. Dr. Saber contends ████████████

████████████████████████████████████████████████

███████████████████████████████ *See* Flaherty Decl., Ex. 28 ("Saber Reply"), ¶¶42-43. However, Freer is silent as to any "predefined tolerance" for the object detection. SOF ¶¶3-4. For example, as explained with respect to Table 1 of Freer, Freer's algorithm was used to identify an object having an area of 211 and shape factor of 3.11 from amongst 44 pixel clusters because the identified object's area was greater than the (area) threshold of 150 and shape factor was greater than the (shape factor) threshold of 2.5. SOF ¶4.

But the '652 Patent separately describes and claims a predetermined value and a predefined tolerance. '652 Patent, 5:5-10 ("The characteristic and value form an object qualifying parameter. Detected objects meeting the qualifiers, or falling within the value range of the selected qualifiers (i.e. determined by percentage error an a predefined tolerance or some other well known comparison technique), are further defined by techniques described below."). Based on this, a POSA would understand the claim language to require the presence of both a "predetermined value" and a "predefined tolerance." Thus, even if the (area) threshold or (shape factor) threshold of Freer is assumed to be a "predetermined value of the moving object of interest" as recited in claim 1 or claim 9, Freer does not disclose any "predefined tolerance" used for "determining if a value of the characteristic for each detected moving object is within a predefined tolerance of the

███████████████████████████████████████

predetermined value of the moving object of interest" as required by claims 1-2, 4, 9-11, and 14 and thus Freer does not anticipate these claims.

> **b.      Freer does not disclose "detecting moving objects <u>only</u> within said selected monitoring area"**

Freer also does not disclose the "only" limitation recited in claims 1, 3, 10, and 18. As a result, Freer also does not anticipate claims 2 and 4-8 that depend therefrom.

Dr. Saber contends ██████████████████████████████████████

██████████████████████. *See* Saber Reply, ¶¶45-47. However, while Freer discusses "a coded bitmap representation of the original scene being viewed" and that "[t]his bitmap representation is segmented into areas which have significance in terms of the physical security of that area," Freer does not disclose object detection is performed "**<u>only</u>**" in any particular area. To the contrary, Freer explicitly discusses "risk factors" of different values assigned to each area and calculating a "mean" risk factor based on these risk factors, which would only be used where different risk factors are considered to make a mean calculation. SOF ¶6. Therefore, Freer does not anticipate claims 1-8, 10, or 18.

> **2.      MacCormack does not anticipate the Asserted Claims**

MacCormack discloses a video information storage and analysis apparatus. MacCormack, Abstract. MacCormack discloses four separate image analysis software tools – a light tool, a perimeter violation tool, a motion detection tool, and a museum tool. SOF ¶8. The image analysis tools are associated with user interfaces that include sliders for setting thresholds. SOF ¶9.

> **a.      MacCormack does not disclose "determining if a value of the characteristic for each detected moving object is within a predefined tolerance of the predetermined value of the moving object of interest"**

MacCormack does not disclose the "predefined tolerance" limitation recited in claims 1, 4, 9, and 14 or incorporated in dependent claims 2 and 10-11.

███████████████████████████████████████████████

In particular, as set forth below, none of the image analysis tools discussed in MacCormack detect objects using a "predetermined value" of a characteristic as well as a "predefined tolerance" for that same characteristic. As discussed above with respect to Freer, a "predefined tolerance" includes a value range of the "predetermined value."

Dr. Saber contends ████████████████████████████████████████

████████████████████   *See* Saber Reply, ¶¶60-78. However, none of the 4 image analysis tools discussed in MacCormack includes both a "predetermined value" and determining if a value of the characteristic is within a "predefined tolerance." With respect to the light tool, MacCormack discusses the use of a "size of the spot 2572," which is "indicative of the size of a light spot to be detected." SOF ¶10. However, while MacCormack discusses the use of a "sensitivity setting" with the light tool, the "sensitivity setting" is not a predefined tolerance for the characteristic—size— that the "size of the spot 2572" represents. Instead, the sensitivity setting is a threshold "for determining whether the change over from dark to light or light to dark has taken place, or whether the illuminated area to be detected in the spot light mode is sufficiently bright to constitute an event to be detected." SOF ¶11.

Regarding the motion detection tool, MacCormack discusses "thresholds for such factors as the amount of motion detected in the active zone and/or luminance levels." SOF ¶12. However, even if any such "thresholds" correspond to a "predetermined value" as recited in claims 1, 4, 9, or 14, such as a "predetermined value" for a motion- or luminance-based characteristic that a moving object of interest would have, MacCormack does not disclose any further "predefined tolerance" with respect to either of these thresholds as required by this claim limitation.

The perimeter violation tool detects "entry of objects into the indicated area" using "the size of the object found to be crossing the perimeter." SOF ¶13. However, MacCormack does not

███████████████████████████████████████████████

disclose any "predefined tolerance" for size that is used for the perimeter violation tool. Instead, the "sensitivity" used with the perimeter violation tool is a "video signal contrast level that will be considered to represent motion rather than noise" which is at most a "predetermined value of a characteristic." SOF ¶¶13-14. It is not a range or tolerance.

Finally, regarding the museum tool, MacCormack discusses "thresholds for factors such as variation in chrominance, numbers of hot spots occluded, or the like," but does not disclose any "predefined tolerance" relative to any such thresholds. SOF ¶15.

████████████████████████████████████ general discussion in MacCormack that "the algorithm is for detecting at least one moving object, the step of setting the parameter may include indicating *at least one of* a maximum size and a minimum size of the object" (emphasis added), MacCormack does not disclose any detail of such a configuration or identify which of the four tools this discussion pertains to. SOF ¶18.[3] Therefore, MacCormack does not disclose at least this limitation and thus does not anticipate claims 1-2, 4, 9-11, and 14 as a result.

> ### b. MacCormack does not disclose "selecting objects of interest from said detected moving objects"

MacCormack also does not disclose "selecting objects of interest from said detected moving objects" as recited in claim 3, and therefore does not anticipate claims 3-8, as claims 4-8 depend from claim 3 and require this limitation that MacCormack lacks.

Dr. Saber contends that MacCormack discloses the use of areas for object detection, such as an "indicated area" for the perimeter violation tool, or "hot spots" for the museum tool. Flaherty Decl., Ex. 29 (Saber Report Ex. A2) at A2.75-A2.79; SOF ¶¶13, 15. Dr. Saber also acknowledges

███████████████████████████████████████████████ (Saber

---

[3] ███████████████████████████████████████
███████████████████████████████████████████████

██████████████████████████

Reply, ¶81), but then argues █████████████████████████████████

██████████████████████████████████████████

████████████████████████████████. Saber Reply, ¶¶81-83.

However, even if MacCormack discusses "detecting moving objects" in the indicated area of the

perimeter violation tool or the hot spots of the museum tool, MacCormack does not disclose any

additional "selecting" of "objects of interest from said detected moving objects" that are detected

in the indicated area of the perimeter violation tool or the hot spots of the museum tool. SOF ¶16.

Therefore, MacCormack does not disclose this claim limitation and thus does not anticipate claims

3-8.

### 3. Crabtree does not anticipate the Asserted Claims

Crabtree discloses a tracking system which tracks objects through a scene using video

information representative of activity in the scene. Crabtree at 1:39-42. Crabtree discloses region

cluster size constraints in the form of minimum/maximum width and minimum/maximum height.

Crabtree at 7:23-32. Crabtree also discloses a queue analysis in which an area of the scene is

selected and for each object track that enters within the specified area, the length of time that the

track overlaps the area is calculated so that if the length of time exceeds a predetermined threshold,

then the object is said to be in the queue. Crabtree at 38:22-50.

#### a. Crabtree does not disclose "detecting moving objects within said selected monitoring area" and "determining if a value of the characteristic for each detected moving object is within a predefined tolerance of the predetermined value of the moving object of interest"

Crabtree does not disclose either the "only" limitation or the "predefined tolerance"

limitation and thus does not anticipate claims 1, 3, 9, 14, and 18 which require one of these

limitations; or claims 2, 4-8, 10-11 which depend from one of these claims.

As the Court already knows from the claim construction process, Crabtree was the reference the applicant distinguished based on the "only" limitation. *See* D.I. 68 at 8; D.I. 8-1 at 44. ("However, nowhere does Crabtree describe or suggest receiving an indication of a selected monitoring area in a field of view of the video frame and detecting moving objects only within the selected monitoring area. Rather, Crabtree describes generating the regions or region clusters based on the entire field view of the video frame.") Following that argument, the patent issued.

Dr. Saber contends that Crabtree's queue analysis process meets the "only" and "predefined tolerance" limitations. *See, e.g.*, Flaherty Decl., Ex. 30 ("Saber Report, Ex. A3") at A3.26; SOF ¶24; *see also* Saber Reply, 96. However, first, Crabtree does not limit object detection to be "only within" the area defined for the queue analysis, but rather Crabtree tracks objects for the view of a camera: "The track supervisor 250 provides object tracks in real-world coordinates for the view of a scene from a single camera to the track manager 260." SOF ¶23. This enables Crabtree's queue analysis to determine when object tracks enter the area selected for the queue, as opposed to only detecting objects in that area: "For each object track that enters within the specified area, the length of time that the track overlaps the area is calculated." SOF ¶24. This is also consistent with Applicant's amendments and arguments noted above, which distinguished Crabtree to bring claim 1 to allowance.

Second, Crabtree's queue analysis process does not use a "predefined tolerance" for the same characteristic as any "predetermined value of the moving object of interest." Dr. Saber points to Crabtree's generation of a set of "region clusters." Saber Report, Ex. A3 at A3.24. But that section relates only to the evaluation of the size of the "bounding box" used in generating these clusters. SOF ¶25. These are the ***areas*** that are evaluated for potential objects—they are not the objects themselves. In other words, the region cluster construction does not evaluate whether a

characteristic of a moving object is within a predefined tolerance, as required by claims 1 and 9. Dr. Saber also points to Crabtree's "queue analysis." Saber Report, Ex. A3 at A3.24-26. Crabtree's queue analysis compares the position of object tracks with an area of the scene – not the height or width of the object track, as well as detection of temporal/spatial conditions. SOF ¶¶24, 26. These relate to position and not, for example, the height/width/size which would be a characteristic of the object. SOF ¶¶24, 26. Furthermore, there is no teaching in Crabtree's queue analysis of a "tolerance" that is being applied as required by this limitation. Instead, Crabtree's queue analysis is merely looking at the position of the object and whether it in the selected area. SOF ¶¶21-26.

> **b.** **Crabtree does not disclose "receiving from a user an object qualifying parameter representative of the characteristic with the predetermined value of the moving object of interest"**

Crabtree does not disclose "receiving from a user an object qualifying parameter" and thus does not anticipate claim 9 or claim 10 which depends therefrom and thus requires this limitation that Crabtree lacks.

The Applicant distinguished now-granted claim 9 from Crabtree by amending claim 9 to recite "receiving from a user an object qualifying parameter representative of the characteristic with the predetermined value of the moving object of interest." D.I. 44 at 223-224.

Saber does not identify any features of Crabtree, other than those such as width, height, and total pixels cited for claim 1's limitation of "receiving an object qualifying parameter representative of the characteristic with the predetermined value of the moving object of interest" (which does not include the "from a user" terms), to contend that Crabtree meets this limitation. Saber Report, Ex. A3 at A3.65; Saber Report, Ex. A3 at A3.7-A3.14.

Moreover, although Crabtree discusses the use of parameters such as width and height, Crabtree does not disclose that these parameters are received "from a user." SOF ¶22.

███████████████████████████████████████

### 4.     Ito does not anticipate the Asserted Claims

Ito discloses an image processing and monitoring system using an image input device. Ito, 1:12-17. Ito performs object detection and classifies objects into categories for processing. Ito, 10:57-11:3. Such categorization occurs based on temporal and/or spatial physical quantities of the detected objects. *Id.*

#### a.     Ito does not disclose "detecting moving objects within said selected monitoring area"

Ito does not disclose the "only" limitation of claims 1, 3, 10 and 18, or claims 2 and 4-8 which depend therefrom.

████████████████████████████████████████████

████████████████████████████████████████████

████████████  Ito specifically teaches detecting objects outside of the areas 1801, 1901 because Ito recognizes objects as objects to be monitored even outside of the areas 1801, 1901. "The person 1804 and the fallen leaf 1807, on the other hand, are recognized as objects to be monitored, and therefore when they enter the area 1801 to be monitored, an alarm is issued or displayed on the monitor. In the case of FIG. 18, the person 1804 has yet to enter the area 1801 to be monitored, and therefore no alarm is issued or displayed on the monitor. When he advances more and enters the area to be monitored 1801, however, an alarm is issued or displayed on the monitor." SOF ¶¶29-30. The embodiment of Figure 19 works in the same way—it detects both inside and outside of the area to be monitored. Ito 19:24-57. ████████████████████████████████████

████████████████████████████  Therefore, Ito clearly teaches monitoring outside of the areas of interest and does not disclose this limitation. Thus, Ito does not anticipate claims 1-8, 10, or 18.

███████████████████████████████████████

**b.      Ito does not disclose "receiving from a user an object qualifying parameter representative of the characteristic with the predetermined value of the moving object of interest"**

Ito also does not disclose "receiving from a user an object qualifying parameter representative of the characteristic with the predetermined value of the moving object of interest" as required by claim 9 and thus does not anticipate claims 9-11 since claims 10-11 depend from claim 9 which requires this limitation that Ito lacks.

███████████████████████████████████████

██████████████████████ Ito discusses setting parameters at the factory or at "by the shipment"—whatever that means—not by the user. For example, in a "step 100, criteria or test for determining whether to track a detected object or not is set. This step occurs in the factory before the object tracking and monitoring apparatus is shipped to the user or can be set after by the shipment." SOF ¶31. Ito therefore contains no teaching that a user can select any of these parameters and instead teaches that these parameters are not exposed to users. Thus Ito does not disclose this claim limitation and does not anticipate claims 9-11.

## V.     MOTION FOR PARTIAL SUMMARY JUDGMENT NO INVALIDITY OF U.S. PATENT NO. 7,307,652 UNDER THE ON-SALE BAR

Genetec contends that the asserted claims of the '652 Patent are invalid under the on-sale bar based on two contract engineering agreements (CEAs) between Sensormatic Video Products Division ("Sensormatic VPD") and '652 Patent inventor Raymond Broemmelsiek's former company Spin Logic. SOF ¶5. The two CEAs are dated August 7, 1998 and December 3, 1998 ("1998 Agreements"). SOF ¶5. The '652 Patent's critical date is March 10, 1999. SOF ¶2. Genetec contends that, in entering one or both of the 1998 Agreements, Mr. Broemmelsiek commercially exploited the '652 Patent inventions after they were ready for patenting and more than one year before his March 10, 2000 provisional filing.

Genetec's theory is legally and factually deficient. Unusually, Genetec's proffered evidence consists of the very documents that Mr. Broemmelsiek and prosecuting attorney Frank Cona submitted to the PTO during prosecution as evidence of Mr. Broemmelsiek's priority of invention over the asserted Ito reference. Namely, applicants submitted the 1998 Agreements themselves, the accompanying statements of work (SOWs), a "development task estimate" prepared on or about August 7, 1998, and an excerpt of a draft "Technology License Agreement" bearing multiple August and September 1999 dates (collectively "Spin Logic documents"). SOF ¶¶29-30. These documents were before two different Examiners. Neither raised an on-sale rejection. SOF ¶31.

As the Examiners silence implies, the Spin Logic documents did not put Mr. Broemmelsiek's inventions on sale but rather reflect plans to develop and test the inventions disclosed and claimed in his '171 Provisional and resulting '483 Application, '441 Application, and '484 Application, which led to the asserted '652 Patent. SOF ¶2. For the reasons set forth below, the Court should grant summary judgment of no invalidity under the on-sale bar.

### A.     Legal Standards

"An invention is 'on sale' under § 102(b) when it is 'the subject of a commercial offer for sale,' and is ready for patenting." *BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 969 (Fed. Cir. 2020) (quoting *Pfaff v. Wells Elecs.*, 525 U.S. 55, 67 (1998)). The existence of a commercial offer for sale is assessed based on traditional contract law principles. *See Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1048 (Fed. Cir. 2001). Patented products, systems, and other tangible items are deemed on-sale when they are "the subject of a commercial sale or offer for sale … bear[ing] the general hallmarks of a sale pursuant to Section 2-106 of the Uniform Commercial Code." *Meds. Co. v. Hospira, Inc.*, 827 F.3d 1363, 1365, 1374 (Fed. Cir. 2016). Patented processes may

be deemed on-sale based on the actual performance of the process before the critical date for commercial purposes, or based on a commercial offer made before the critical date to perform the process for commercial purposes. *See Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1163 (Fed. Cir. 2006).

An offer/sale does not trigger the on-sale bar if the commercial benefit is merely incidental to a primary purpose of experimentation. *See Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1329 (Fed Cir. 2019) ("Receipt of payment, if sufficiently incidental to an experiment, is not automatically disqualifying."); *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002) (requiring a "commercial offer for sale not primarily for purposes of experimentation"). Courts may consider the factors identified in *Allen* in assessing whether the circumstances surrounding the transaction show that the transaction was not primarily for purposes of experimentation. *See Barry*, 914 F.3d at 1328 (quoting *Allen*, 299 F.3d at 1353).

Pre-commercialization activities aimed at making an invention commercial, even if accompanied by payment, do not themselves implicate the on-sale bar. *See BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 969 (Fed. Cir. 2020) ("The invention itself must be sold or offered for sale, and the mere existence of a 'commercial benefit . . . is not enough to trigger the on-sale bar' on its own."); *Meds. Co. v. Hospira, Inc.*, 827 F.3d 1363, 1377 (Fed. Cir. 2016) (contract manufacturing services did not trigger on-sale bar) ("It is well-settled that mere preparations for commercial sales are not themselves 'commercial sales' or 'commercial offers for sale' under the on-sale bar."); *In re Kollar*, 286 F.3d 1326, 1334 (Fed. Cir. 2002) ("[T]he grant of a license, albeit accompanied by some payment, is only part of the pre-commercialization process aimed at making the invention commercial. The on-sale bar is not implicated by such activities.").

**B.      Argument**

**1.      No Commercial Offer for Sale: The Primary Purpose of the 1998 Agreements Was Experimentation, Not Commercial Exploitation**

The 1998 Agreements concerned pre-commercial development activity undertaken primarily for purpose of experimentation. They were not commercial offers, sales, or exploitation of the '652 Patent systems, computer-readable media (CRM), or methods, and they do not implicate the on-sale bar. There is no genuine dispute as to their experimental rather than commercial nature, and summary judgment is appropriate.

The 1998 Agreements are not commercial offers or sales of any systems or CRM. The agreements provide no quantities, prices, or other sale terms related to any systems or CRM. SOF ¶8. Nor are the 1998 Agreements commercial offers, sales, or exploitation of any '652 methods. Although method claims may be subject to the on-sale bar, the method must be performed for commercial purposes. *See Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152 (Fed. Cir. 2006) ("Performing the steps of the patented method *for a commercial purpose* is clearly an attempt to profit from the commercial use of an invention. Consequently, performing the patented method *for commercial purposes* before the critical date constitutes a sale under § 102(b)." (emphasis added)).

The undisputed evidence shows that Mr. Broemmelsiek's primary purpose in entering the 1998 Agreements was the non-commercial or pre-commercial purpose of developing and testing whether his inventions would work for their intended purposes and to test their features. *Compare Meds. Co. v. Hospira, Inc.*, 827 F.3d 1363, 1378 (Fed. Cir. 2016) ("MedCo made a pre-commercial investment—an outlay of $347,500—when it paid Ben Venue for the service of reducing its invention to practice."); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 997 (Fed. Cir. 2007) ("Honeywell performed tests to determine that the invention

worked for its intended purpose. These tests, however, were part of the Honeywell effort to reduce the invention to practice, rather than an actual reduction. Following these tests, Honeywell still had work to do to ascertain the success of the operation. Further, the documents show that the system was still in development at the time of the tests and the other documentation."); *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, No. 16-41-CFC, 2019 U.S. Dist. LEXIS 65300, at *5-7 (D. Del. Apr. 17, 2019) (no genuine dispute as to whether "f'real offered for sale its FRLB2 self-rinsing blender to QuikTrip before November 2002" where f'real's 30(b)(6) witness declared that "QuikTrip made it clear that they would only purchase f'real's blenders and place them in QuikTrip's over 500 convenience stores *if f'real could invent and build a self-serve blender*").

Several *Allen* factors reinforce this conclusion. The 1998 Agreements indicate that a secrecy obligation existed through non-disclosure agreements put in place to protect information exchanged between the parties during their collaboration. SOF ¶15. *Meds. Co. v. Hospira, Inc.*, 827 F.3d at 1376 ("[T]he confidential nature of the transactions is a factor which weighs against the conclusion that the transactions were commercial in nature."). Mr. Broemmelsiek maintained control over the source code throughout the period of the 1998 Agreements. SOF ¶17. Mr. Broemmelsiek also testified to multiple instances of testing that he personally conducted and/or monitored. SOF ¶16. He also recounted doubts he expressed to Sensormatic personnel as late as approximately early January 1999 about his ability to meet the Phase 2 deadline, the final demo for which was scheduled for *after* the critical date, on March 26, 1999. SOF ¶18.

Further, the payments listed in the 1998 Agreements do not reflect a primarily commercial purpose and do not establish "commercial exploitation." Remuneration by itself does not establish commercial purpose. *See Barry*, 914 F.3d at 1329 ("Receipt of payment, if sufficiently incidental to an experiment, is not automatically disqualifying."). In fact, the details of the payments

███████████████████████████████████████

underscore the experimental nature of the agreements. The payments were scheduled in installments. SOF ¶9. Both the August and December agreements provided for an upfront payment ($25K), a payment for successful completion of a preliminary design review ($25K), and a payment for successful completion of a demo and approval by Sensormatic engineering ($30K). SOF ¶9. After the first, each payment was contingent on successful completion of the corresponding step in the development process, and both agreements expressly gave Sensormatic "the right to discontinue the project at any time." SOF ¶10. Mr. Broemmelsiek characterized the use of payment installments as intended to "keep the lights on … and …also give the client the opportunity to cancel if they want if they don't see progress." SOF ¶12. The August 1998 agreement also makes clear that progression to "Phase 2," addressed by the December 1998 agreement, was "contingent" on successful completion of "Phase 1," addressed by the August agreement. SOF ¶13. The 1998 Agreements contain no provisions obligating either party to enter into ████████████████████████████████, or into the post-critical date Technology Licensing Agreement. SOF ¶14.

This case bears no resemblance to decisions such as *Plumtree* that find a commercial offer/sale of a patented method. Mr. Broemmelsiek agreed at most to attempt to use and perform his inventions as the culmination of a development project. *Meds. Co. v. Hospira, Inc.*, 827 F.3d 1363, 1371, 1374 (Fed. Cir. 2016) ("The cases on which Hospira relies uniformly involve process or method patents in which the (1) inventors sought compensation (2) from the buying public for (3) performing the claimed processes or methods."). Sensormatic was not a member of the "buying public" nor a customer of Spin Logic, but a development partner.

Despite Genetec's efforts to cast the Spin Logic-Sensormatic collaboration as an improper pre-critical date commercial exploitation, the 1998 Agreements were clearly for the non-sale

purposes of development and testing Mr. Broemmelsiek's inventions. Any 'commercial' aspects, including compensation to Spin Logic/Mr. Broemmelsiek, was incidental to that experimental purpose. To the extent any use was made of any system, method, or computer-readable medium ultimately claimed in the '652 Patent, such use was confidential, controlled by Mr. Broemmelsiek, and for the purposes of development and experimentation. The modest compensation to Spin Logic was for engineering work and contingent on development progress. Sensormatic VPD was free to terminate the collaboration at any time. Far from a means for Mr. Broemmelsiek to extend the patent monopoly on his inventions, the 1998 Agreements enabled Mr. Broemmelsiek to complete his inventions while earning enough to "keep the lights on." Such activities do not implicate the on-sale bar. The material facts are not in dispute, and summary judgment is appropriate.

### 2. No Evidence that Detecting Only Within a Selected Monitoring Area Was Fully Conceived or Ready for Patenting Before March 10, 1999

There is no evidence that the "selected monitoring area" and "detecting only within" elements recited in claims 1, 3, 10, 18, 21, and 22 had been reduced to practice or otherwise ready for patenting before the March 10, 1999 critical date. Accordingly, neither of the 1998 Agreements can be an invalidating offer/sale of the inventions recited in those claims or their dependent claims.

Genetec and Dr. Saber identify two statements in the Spin Logic documents as establishing readiness for patenting. First, Genetec points to "polygon exclusion," which is referenced only in the December 1998 SOW: "Phase 2 shall *add* the capability for polygon exclusion. The reason for this is that a slowly swaying tree may be treated as a viable target by the system, and the user may want to exclude that specific polygonal area from considering for acquiring new target tracks." SOF ¶19 (emphasis added). Even assuming that the planned "polygon exclusion" feature corresponds to the "selected monitoring area" and "detecting only within" claim elements, there is no evidence that polygon exclusion was ready for patenting or reduced to practice any earlier than

the Phase 2 Final Demo, which had been scheduled for March 26, 1999—*after* the critical date—and which Mr. Broemmelsiek confirmed happened at the end of March. SOF ¶¶21-22.

The December 1998 SOW itself does not establish a complete conception, much less readiness for patenting. Its only reference to polygon exclusion provided a one-sentence, high-level description of future activity. *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) ("Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation."). Neither Mr. Broemmelsiek's testimony nor Dr. Saber's opinions fill the gaps. Genetec asked and Mr. Broemmelsiek confirmed that "polygon exclusion" referred to the "exclusion zone" disclosed in his related '441 Application to prevent detection in certain areas. SOF ¶20. Mr. Broemmelsiek was not asked and did not testify about when the polygon exclusion feature was developed and shown to work for its intended purposes, or whether and when any subsequent descriptions or drawings regarding polygon exclusion were prepared. Genetec did not ask whether any of this occurred prior to the March 10, 1999 critical date, not until the end-of-March Phase 2 Final Demo, or sometime after. Nor did Genetec ask whether Mr. Broemmelsiek viewed the one-sentence reference in the December 1998 SOW as an enabling description. Dr. Saber offers no opinion on the enablement question, but simply notes the same one-sentence reference to polygon exclusion. None of the Phase 2 SOW, Mr. Broemmelsiek's testimony, or Dr. Saber's opinion provides clear and convincing evidence of *when* in Phase 2, if at all, these features were fully conceived or shown to work or described in an enabling manner.

Second, Genetec points to statements in the excerpt of a draft Technology License Agreement (Draft TLA) that was submitted to the PTO with the 1998 Agreements. Specifically,

Dr. Saber refers to a statement about "Enhanced Features" developed by Mr. Broemmelsiek's company, among which was "the ability to watch for moving targets within a defined region in the field of view of the camera." SOF ¶27. Even assuming that this "enhanced feature" corresponds to the "selected monitoring area" and "detecting only within" claim elements, the Draft TLA provides no evidence, much less clear and convincing evidence, that Mr. Broemmelsiek had fully conceived the feature, reduced the feature to practice or otherwise had it ready for patenting before the March 10, 1999 critical date. The Draft TLA itself bore three different dates, but all were in August or September of 1999 (Aug. 20, Aug. 31, Sept. 8), approximately six months *after* the critical date. SOF ¶¶26-28. Mr. Broemmelsiek confirmed that he signed a version of the TLA sometime in 1999 (SOF ¶28), which logically could not have been any earlier than the Aug./Sept. 1999 dates of the Draft TLA. However, Mr. Broemmelsiek was not asked about the "enhanced features," nor about specifically when "the ability to watch for moving targets within a defined region in the field of view of the camera" was developed and shown to work for intended purposes.

At most, the December 1998 SOW suggests that, as of December 3, 1998, polygon exclusion was planned for Phase 2; the Draft TLA suggests "the ability to watch for moving targets within a defined region in the field of view of the camera" had been developed sometime before August 20, 1999; and Mr. Broemmelsiek testified that he agreed to build a system performing such features, but did not specify *when* he built it. None of these documents or this testimony can provide clear and convincing evidence that the "selected monitoring area" and "detecting only within" elements were reduced to practice or otherwise ready for patenting before March 10, 1999. Dr. Saber's opinion about these documents and this testimony does nothing to clarify or to establish readiness for patenting of the inventions recited in these claims before March 10, 1999.

Consequently, even if either or both of the 1998 Agreements had been commercial offers/sales (they were not), there is no clear and convincing evidence that either agreement started the one-year grace period of § 102(b) for claims 1, 3, 10, 18, 21, 22, or any of their dependent claims, because "selected monitoring area" and "detecting only within" were not yet ready for patenting. Accordingly, the Court should grant summary judgment of no invalidity under the on-sale bar at least as to these claims.

## VI.   MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT IN SECURING U.S. PATENT NO. 7,307,652

In response to Sensormatic's infringement allegations, Genetec asserts an Eighteenth Affirmative Defense alleging that all claims of the '652 Patent, which stem from the '484 Application, are unenforceable "due to the inequitable conduct by one or more of the named inventors or prior assignees during the prosecution thereof." (D.I. 8 at 8.) Genetec raises parallel allegations in Count III of its Counterclaims. (*Id.* at CC ¶¶18-19.) More specifically, predicated on allegations based "[o]n information and belief," Genetec claims that "one or more of Mr. Broemmelsiek, Mr. Cona, Mr. Sotiriou, and/or others involved in the prosecution of the '484 Application deliberately deceived the USPTO in attesting that the '484 Application had been unintentionally abandoned" and "caused or assisted in the filing of a false statement … 'that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this section was unintentional', which was required per 37 CFR 1.137(b) to revive the '484 Application." (*Id.* at ¶¶38, 61.) According to Genetec, "[b]ut for this attestation, the USPTO would not have granted the Petition to Revive and the '652 Patent would not have issued." (*Id.* at ¶38.) Genetec is wrong.

Genetec's inequitable conduct Affirmative Defense and Counterclaim are based entirely on attorney argument and rank speculation about the prosecution histories of the '652 Patent and

two related applications. But Genetec has no evidence to support their false allegations. There is no evidence of any material misrepresentations to the USPTO during prosecution of the '652 Patent with the intent to deceive the examiner and the USPTO. Indeed, the evidence is to the contrary. Mr. Cona's testimony is unequivocal: "**We had no intention to abandon the application.**" SOF ¶29. And, the entire delay in filing the Petition to Revive was unintentional. SOF ¶24. Genetec has nothing to contradict the evidence of record from the depositions of Messrs. Broemmelsiek, Sotiriou, and Small, and Genetec elected not to depose any other potentially relevant witnesses despite having the opportunity to do so. SOF ¶33.

At least because there is no credible issue of disputed fact relating to any specific intent to deceive the USPTO during the Petition to Revive the '484 Application by any of Mr. Broemmelsiek, Mr. Cona, or Mr. Sotiriou, Genetec has failed to adduce evidence sufficient to carry their clear and convincing burden at trial. Thus, summary judgment of no inequitable conduct should be granted.

### A.     The Prosecution of the '652 Patent

The '484 Application that led to the asserted '652 Patent claims priority to the '171 Provisional, as do the '483 and '441 Applications. SOF ¶¶1-3. Raymond Broemmelsiek is the sole named inventor of these Applications. SOF ¶4. Prosecution of Broemmelsiek's applications was managed initially by in-house counsel at Sensormatic's predecessor, Sensormatic Electronics Corporation, and later, by Tyco Fire & Security Services ("TFSS"). SOF ¶5. In-house counsel Frank A. Cona took over management of patent prosecution for TFSS's Sensormatic portfolio, including the Broemmelsiek applications, in February 2004. SOF ¶6.

With respect to the prosecution of the '484 Application, on May 28, 2004, the USPTO mailed the IP Legal Department of TFSS a final office action rejecting the claims of the '484

Application. SOF ¶7. On August 30, 2004, Mr. Cona submitted a response to the May 28 office action detailing Tyco's disagreement. SOF ¶8. On October 19, 2004, the USPTO mailed TFSS' IP Legal Department an advisory action indicating that the '484 Application remained in rejection based on the May 28 office action, notwithstanding the August 30 response. SOF ¶9. On December 17, 2004, the USPTO mailed a Notice of Abandonment to TFSS' IP Legal Department, indicating that the '484 Application had gone abandoned. SOF ¶10.

Abandonment of the '484 Application was unintentional. SOF ¶11. Upon realizing that the '484 Application had unintentionally gone abandoned in or around June 2005 (SOF ¶12), TFSS personnel initiated preparation of a petition to revive. SOF ¶13. In particular, on June 10, 2005, Mariah Moorhead, then a Patent Administrator at TFSS, engaged outside counsel Dean D. Small, then of Armstrong Teasdale LLP, to prepare and file a petition to revive the '484 Application. SOF ¶14. Mr. Small in turn assigned his colleague at Armstrong Teasdale, Evan R. Sotiriou, to prepare the petition to revive and accompanying filings. SOF ¶15.

The Petition to Revive the '484 Application was filed with the USPTO on May 18, 2006, using the approved USPTO form. SOF ¶23. This form contains the required statement that "[t]he entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 CFR 1.137(b) was unintentional." SOF ¶25. This statement was true and correct. SOF ¶26. Contrary to Genetec's supposition, the '484 Application was not deliberately abandoned "in favor of" the related '483 Application, (D.I. 8 CC at ¶¶41-47), or revived due to a perceived "negative trajectory" in the related '441 Application. (*Id.* at ¶¶48-53.) While the USPTO form notes that "[t]he [USPTO] may require additional information if there is a question as to whether either the abandonment or delay in filing a petition … was unintentional," the USPTO did not raise any question or request additional information regarding

the unintentional abandonment of the '484 Application. SOF ¶27. The USPTO granted the

Petition to Revive on September 14, 2006. SOF ¶28. Following its revival, the '484 Application

was allowed on August 24, 2007, and issued as the '652 Patent on December 11, 2007.

### B.     Genetec Cannot Meet Its Burden of Proof on Inequitable Conduct

"To prove inequitable conduct, the challenger must show by clear and convincing

evidence that the patent applicant (1) misrepresented or omitted information material to

patentability, and (2) did so with specific intent to mislead or deceive the PTO." *Network*

*Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1242 (Fed. Cir. 2013). "The

intent requirement is demanding: the evidence must be 'sufficient to *require* a finding of

deceitful intent in the light of all the circumstances'; deceptive intent 'must be the single most

reasonable inference able to be drawn from the evidence'; and 'when there are multiple

reasonable inferences that may be drawn, intent to deceive cannot be found.'" *Intercontinental*

*Great Brands*, 869 F.3d at 1351 (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d

1276, 1290-91 (Fed. Cir. 2011) (*en banc*)). "[I]t is not enough to argue carelessness, lack of

attention, poor docketing or cross-referencing, or anything else that might be considered

negligent or even grossly negligent," *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1374-75

(Fed. Cir. 2012), because "[n]egligence … even gross negligence, is not sufficient to establish

deceptive intent." *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1292

(Fed. Cir. 2012) (collecting cases).

A genuine dispute on intent to deceive exists only if it is reasonable to view the summary

judgment record as providing clear and convincing evidence that *requires* a finding of deceptive

intent and permits no other reasonable inference. *See Intercontinental Great Brands*, 869 F.3d at

1351. Genetec cannot meet their burden of demonstrating deceptive intent with any evidence let

alone clear and convincing evidence.

For Genetec to avoid summary judgment on its inequitable conduct Affirmative Defense and Counterclaim, it must be reasonable to view the summary judgment record as providing clear and convincing evidence that one or more of Messrs. Broemmelsiek, Cona, and Sotiriou (1) intentionally abandoned the '484 Application or intentionally delayed petitioning for revival, such that the statement of unintentional delay to the USPTO was a material misrepresentation; (2) knew the abandonment or delay was intentional, and therefore knew the statement was a material misrepresentation; and (3) either submitted the statement or allowed it to be submitted, not due to anything "that might be considered negligent or even grossly negligent," but with the specific deceptive intent of convincing the USPTO of what they knew was untrue. Genetec has no evidence that raises a genuine dispute on any of these issues, making summary judgment of no inequitable conduct appropriate.

### 1.    Mr. Broemmelsiek

Genetec never particularly alleged misconduct by Mr. Broemmelsiek. Genetec only noted his inventorship of other patents, alleged his familiarity with the duty of candor, and occasionally referred to "Mr. Broemmelsiek, Mr. Cona, Mr. Sotiriou, and/or others" in their pleading. (D.I. 8 at CC ¶¶38, 61.) In discovery, Genetec has not adduced any evidence of misrepresentation or deceptive intent by Mr. Broemmelsiek, nor that he even knew the '484 Application had gone abandoned or been revived.

### 2.    Mr. Cona

Similarly, with Mr. Cona, Genetec has no evidence that he intentionally abandoned the '484 Application or intentionally delayed petitioning for its revival. There is no evidence that Mr. Cona believed revival of the '484 Application was improper, that the statement of unintentional delay was a misrepresentation, or that he intended it as a deception on the USPTO.

███████████████████████████████████████████████

Indeed, the testimony is to the contrary. Mr. Cona testified repeatedly that he did not intend to let

the '484 Application go abandoned, that he did not deliberately fail to file a response to the

pending office action, and that he believes the statement of unintentional delay was true. SOF

¶¶11, 26, 29, 31. ████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████. SOF ¶30.

### 3.   Mr. Sotiriou

Genetec makes two central allegations against Mr. Sotiriou, another third-party witness

outside the trial subpoena power of the Court: (a) he believed that the '441 Application was

doomed to fail and, acting on that belief, strategically revived the '484 Application to "reclaim

claim scope" that would be lost with the '441 Application, (*see, e.g.*, D.I. 8 at CC ¶¶50-53, 58),

and (b) he breached a duty of candor by failing to investigate the circumstances of abandonment

in preparing the petition to revive. (*See id.* at ¶¶35, 62.) Genetec has no evidence for either of

their "theories."

There is no evidence that Mr. Sotiriou believed the '441 Application was doomed to fail,

revival was sought based on such belief, or that the '484 Application was the vehicle for such

maneuvering. What Genetec calls the "negative trajectory" and "impending demise" of the '441

Application is merely the present-day, hindsight assessment of Genetec's attorneys. In

deposition, Genetec did not even test their theory. None of Messrs. Sotiriou, Cona, or Small were

deposed about their subjective beliefs about the trajectory or likely outcome of the '441

Application at the relevant times. Instead, Mr. Small directly contradicted Genetec's speculation

by clarifying that his firm took over prosecution of the '441 Application *after* being engaged to

revive the '484 Application. SOF ¶32. Mr. Sotiriou could not have decided to revive the '484

Application based on the "trajectory" of a different application he was not yet even involved

████████████████████████████████████████

with. And, the decision to file a petition to revive was not even one for Mr. Sotiriou to make. Messrs. Cona, Small, and Sotiriou confirmed that Mr. Sotiriou was assigned that task by Mr. Small, whom Mr. Cona had engaged. SOF ¶¶14-15.

Genetec has also not adduced any evidence that Mr. Sotiriou ever believed or even suspected that the '484 Application had been intentionally abandoned, that Mr. Sotiriou intentionally delayed the preparation or filing of the Petition to Revive the '484 Application, or that Mr. Sotiriou believed the statement of unintentional delay submitted to the USPTO was untrue or deceptive. There is no evidence whatsoever that, in petitioning to revive the '484 Application, Mr. Sotiriou ever acted, or failed to act, with any intention of deceiving the USPTO.

There is also no evidence supporting Genetec's "failure to investigate" theory. ████████

████████████████████████████████████████

████████. SOF ¶17. Genetec's only "evidence" is the Petition to Revive itself, coupled with Genetec's counsel's belief that the '484 Application *must* have been intentionally abandoned, such that *had* Mr. Sotiriou investigated, he *would* have learned it was intentional and would not have signed the Petition. Genetec's theory is speculation heaped on speculation – this is not evidence sufficient to survive summary judgment of no inequitable conduct. At most, Genetec's failure-to-investigate theory amounts to the sort of "negligence" that is legally insufficient post-*Therasense*, rendering summary judgment of no inequitable conduct appropriate. *See Outside the Box Innovations*, 695 F.3d at 1292.

## VII.   CONCLUSION

For the foregoing reasons, Sensormatic respectfully requests that the Court grant Sensormatic's motions for partial summary judgment.

ASHBY & GEDDES

*Of Counsel:*

*/s/ Andrew C. Mayo*

Jeffrey N. Costakos
Kadie M. Jelenchick
Kevin J. Malaney
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
(414) 271-2400

Daniel P. Flaherty
FOLEY & LARDNER LLP
321 North Clark Street, Suite 3000
Chicago, IL 60654-4762
(312) 832-4500

Dated: May 26, 2022

Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8TH Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiff Sensormatic
Electronics, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 26th day of May, 2022, the attached **PLAINTIFF'S**

**OPENING BRIEF IN SUPPORT OF PLAINTIFF'S MOTIONS FOR: (1) PARTIAL**

**SUMMARY JUDGMENT OF INFRINGEMENT OF U.S. PATENT NO. 7,307,652; (2)**

**PARTIAL SUMMARY JUDGMENT OF NO ANTICIPATION OF U.S. PATENT NO.**

**7,307,652; (3) PARTIAL SUMMARY JUDGMENT OF NO INVALIDITY OF U.S.**

**PATENT NO. 7,307,652 UNDER THE ON-SALE BAR; (4) SUMMARY JUDGMENT OF**

**NO INEQUITABLE CONDUCT IN SECURING U.S. PATENT NO. 7,307,652** was served

upon the below-named counsel of record at the addresses and in the manner indicated:

Jeremy D. Anderson, Esquire                                    <u>VIA ELECTRONIC MAIL</u>
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE  19801

Neil J. McNabnay, Esquire                                      <u>VIA ELECTRONIC MAIL</u>
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX  75201

Meaghan Luster, Esquire                                        <u>VIA ELECTRONIC MAIL</u>
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210

Andrew R. Graben, Esquire                                      <u>VIA ELECTRONIC MAIL</u>
HILGERS GRABEN PLLC
10000 N. Central Expressway, Suite 400
Dallas, TX 75231

Adam Nynehuis, Esquire                                         <u>VIA ELECTRONIC MAIL</u>
HILGERS GRABEN PLLC
1320 Lincoln Mall, Suite 200
Lincoln, NE 68508

*/s/ Andrew C. Mayo*
_____
Andrew C. Mayo