# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SENSORMATIC ELECTRONICS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> GENETEC (USA) INC. and GENETEC INC., <br><br> Defendants. | C.A. No. 20-760-GBW <br><br> ▉ <br><br> REDACTED VERSION |

## MEMORANDUM OPINION

Anne Shea Gaza, Samantha G. Wilson, YOUNG, CONAWAY, STARGATT & TAYLOR LLP; Jeffrey N. Costakos, Kadie M. Jelenchick, Kevin J. Malaney, Daniel P. Flaherty, FOLEY & LARDNER LLP

*Attorneys for Plaintiff*

Jeremy D. Anderson, AnnaMartina Tyreus Hufnal, Neil J. McNabnay, David B. Conrad, Ricardo J. Bonilla, Michael R. Ellis, Meaghan Luster, Andrew R. Graben, Sarika N. Patel, FISH & RICHARDSON P.C

*Attorneys for Defendants*

January 3, 2023
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiff Sensormatic Electronics, LLC ("Sensormatic") initiated this patent infringement action against Defendants Genetec (USA) Inc. and Genetec Inc. (collectively, "Genetec") alleging that Genetec infringes U.S. Patent No. 7,307,652 (the "'652 patent") and U.S. Patent No. 9,463,954 (the "'954 patent").[1] The claims of the '652 patent are directed to methods and systems for detecting moving objects of interest in a video signal received from a motion video camera. The claims of the '954 patent are directed to systems and methods for providing override access control in elevator systems in situations of a security threat.

Pending before the Court are Genetec's motions for summary judgment of, *inter alia*, invalidity of the '652 patent (D.I. 109) and non-infringement of the '954 patent (D.I. 113). Also pending are Sensormatic's motions seeking summary judgment on multiple grounds with respect to the '652 patent (D.I. 119, 121, 123, and 125).[2] The Court held oral argument on the parties' motions on November 16, 2022.

For the following reasons, the Court grants Genetec's motion for summary judgment on invalidity of the '652 patent due to the on-sale bar. As a result, Sensormatic's motions related to the '652 patent are denied as moot. The Court denies Genetec's motion for summary judgment of non-infringement of the '954 patent due to genuine issues of material facts.

---

[1] The Court writes for the benefit of the parties and assumes their familiarity with these actions.

[2] The Court ordered the parties to rank the grounds for summary judgment raised in their motions "with the understanding that once the Court denies summary judgment as to any single ground raised in Plaintiff's [or Defendants'] motion, the Court will not address any summary judgment grounds that were ranked after that ground." D.I. 193. Sensormatic ranked "No inequitable conduct in securing U.S. Patent No. 7,307,652" first. D.I. 204. Genetec ranked "Invalidity of U.S. Patent No. 7,307,652 due to the on-sale bar" first and "Non-infringement of U.S. Patent No. 9,463,954" second. D.I. 198.

## I. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020). "The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not 'weigh the evidence or make credibility determinations.'" *Id.* (citation omitted). The Court must enter summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [the non-moving] party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Celotex*, 477 U.S. at 322). The U.S. Court of Appeals for the Federal Circuit "reviews a district court's grant of summary judgment under the law of the regional circuit, here the Third Circuit." *Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069, 1075 (Fed. Cir. 2021).

## II. DISCUSSION

### A. Genetec's Motion for Summary Judgment of Invalidity of the '652 Patent Due to the On-Sale Bar Is Granted

Genetec argues the '652 patent is invalid under the on-sale-bar because it was subject to a commercial offer for sale by way of two agreements between the '652 patent's named inventor and Sensormatic. D.I. 110 at 3-12. Sensormatic argues that those agreements were merely "engineering services as part of a confidential development agreement" that either constitute pre-commercialization activities not implicated by the on-sale bar, or are otherwise negated by the experimental use doctrine. D.I. 167 at 12-16. The Court agrees with Genetec.

Thwarting "an inventor's attempt to commercialize his invention beyond the statutory term" is the "overriding concern of the on-sale bar." *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008) (citing *Netscape Commc'ns. Corp. v. Konrad*, 295 F.3d 1315, 1323 (Fed. Cir. 2002)). Accordingly, under 35 U.S.C. § 102(b), "'no person is entitled to patent an 'invention' that has been 'on sale' more than one year before filing a patent application' (i.e., before the critical date)." *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1168 (Fed. Cir. 2022) (quoting *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 57 (1998)).

To prevail on its on-sale-bar defense, Genetec must show that, before the critical date of March 10, 1999,[3] Sensormatic's patented invention was both (1) "the subject of a commercial offer for sale" and (2) "ready for patenting." *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 139 S. Ct. 628, 630 (2019) (quoting *Pfaff*, 525 U.S. at 67). Genetec must "prove the facts underlying both prongs . . . by clear and convincing evidence." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002). As for the "ready for patenting prong", Sensormatic admitted that the claims of the '652 patent were reduced to practice as of August 7, 1998.[4] Thus, the Court

---

[3] The provisional application that led to the '652 patent was filed on March 10, 2000. D.I. 111-2, Ex. 2 at 1.

[4] The "ready for patenting" prong, which can be satisfied "by proof of reduction to practice before the critical date," *Pfaff*, 525 U.S. at 67, is not disputed in view of Sensormatic's responses to Genetec's Requests for Admission "effect[ively] . . . admit[ting] that all of the asserted claims of the '652 patent had been reduced to practice as of August 7, 1998," which is before the critical date of March 10, 1999. D.I. 177; *see also* Tr. 11:16-17 ("[W]e're not really contesting that point for purposes of the motion."). *See In re Cygnus Telecommunications Tech., LLC, Pat. Litig.*, 536 F.3d 1343, 1354 (Fed. Cir. 2008) (affirming district court and binding inventor to statements made in declaration to the PTO admitting reduction to practice by certain date).
Although Sensormatic moved to revise the reduction to practice date it previously identified, the Court, in denying Sensormatic's motion to amend its RFA responses, stated that "there is a significant amount of evidence in the record suggesting that the prior admissions are instead accurate. This includes the fact that: (1) Plaintiff acknowledged the prior admissions were correct three separate times via its interrogatory responses; (2) Plaintiff made the prior admissions

turns to whether Sensormatic's invention was the subject of a commercial offer for sale before March 10, 1999.

### 1. The Phase 1 and 2 Agreements Are Commercial, Not Pre-Commercial, Offers for Sale

The allegedly invalidating commercial activity arises from the file history of the '652 patent, which contains a sworn declaration from named inventor Mr. Raymond Broemmelsiek attaching documents that he admits "set forth the claimed invention": a "Contract Engineering Agreement" and "Statement of Work for the Phase 1 Autonomous Tracker/Controller Project," both dated August 7, 1998, and the "Contract Engineering Agreement" and "Statement of Work for the Phase 2 Autonomous Tracker/Controller Project," both dated December 3, 1998 (collectively, the "Phase 1 and 2 Agreements"). D.I. 111-9, Ex. 9 at 1.

To determine whether the Phase 1 and 2 Agreements constitute commercial offers for sale within the meaning of the on-sale bar, the Court "apply[ies] traditional contract law principles", including whether they contain "essential price, delivery, and payment terms." *Merck & Cie v. Watson Lab'ys, Inc.*, 822 F.3d 1347, 1351 (Fed. Cir. 2016) (citations omitted); *Atlanta Attachment*, 516 F.3d at 1365 ("the offer must be sufficiently definite that another party could make a binding contract by simple acceptance, assuming consideration") (citing *Netscape*, 295 F.3d at 1323). The Court "must focus on those activities that would be understood to be commercial sales and offers

---

in the RFAs at issue (no doubt after very deliberate consideration); (3) the prior admissions are consistent with the testimony of Plaintiff's Rule 30(b)(6) designee, (D.I. 111, ex. 6 at 15:4-24); (4) the prior admissions can be argued to gibe with deposition testimony of the inventor, (id., ex. 7 at 130:5-16, 134:13-20 (inventor Mr. Broemmelsiek admitting that it was correct that he reduced to practice the subject matter of the application leading to the 652 patent -- albeit prior to amendment of some of the patents claims -- as of August 7, 1998)); and (5) the prior admissions can be said to align with a prior declaration from the inventor, (D.I. 129-1 at 30 at para. 2). (D.I. 151 at 1-2)." D.I. 177. To the extent Sensormatic still "intends to appeal this decision", D.I. 199 at 10, the Court will not disturb that ruling here.

for sale "in the commercial community" and, "[a]s a general proposition, [the Court] will look to the Uniform Commercial Code ('UCC') to define whether . . . a communication or series of communications rises to the level of a commercial offer for sale." *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1373 (Fed. Cir. 2016) (quoting *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001)). "The transaction at issue must be a 'sale' in a commercial law sense." *Id.* (quoting *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1361 (Fed. Cir. 2010)). "[A] sale is a contract between parties to give and to pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold." *Id.* (quoting *Trading Techs.*, 595 F.3d at 1361).

On their face, the Phase 1 and 2 Agreements, styled as "Contract[s]" and "Statement[s] of Work", contemplate a "business arrangement" between Mr. Broemmelsiek's company, Spin Logic, and Sensormatic, under which Spin Logic agreed to perform the claimed method and build the claimed apparatus in exchange for a series of payments. *See* D.I. 111-9, Ex. 9 at 9, 13 ("Spin Logic and Sensormatic Video Products Division (VPD) have agreed to enter into a business arrangement to jointly develop a technology demonstration which will prove the feasibility of a closed-loop autonomous tracker/controller for the Sensormatic Dome camera line of products."). The "technology demonstration" Spin Logic agreed to create contained technical descriptions that Mr. Broemmelsiek told the USPTO "set forth the claimed invention" in the '652 patent. D.I. 111-9, Ex. 9 at 2-3 ("The above-identified documents illustrate my conception and diligence in reducing to practice of each and every aspect of the invention set forth in the solicited claims from at least as early as August 7, 1998."); *id.* at 11-12, 15-16. The agreements indicate Spin Logic agreed to perform the claimed method by "help[ing] design[,] develop, integrate, test, document and demonstrate a technology demonstration based on the integration of proprietary Spin Logic

5

Technology with the Sensormatic SpeedDome [in Phase 1 and UltraDome in Phase 2]." D.I. 111-9, Ex. 9 at 11 § 3.0, 15 § 3.0; *Medicines*, 827 F.3d at 1374 ("Offering to perform the steps of the patented methods for customers in exchange for payment triggers the on-sale bar.") (citing *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1163 (Fed. Cir. 2006); *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1328-29 (Fed. Cir. 2001)). The agreements also indicate Spin Logic agreed to build the claimed apparatus and was "responsible for providing all of the required hardware elements of the technology demo, except for the SpeedDome, UltraDome and dome power adapters" and "[t]he demonstration hardware and software/firmware shall be retained by Sensormatic." D.I. 111-9, Ex. 9 at 12 § 5.0; 16 § 5.0; *see also id.* 12 & 16 § 3.0 ("Sensormatic shall retain the demonstration hardware and software/firmware."); *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1364 (Fed. Cir. 2017), *aff'd*, 139 S. Ct. 628 (2019) (explaining "passage of title" an "important" factor and finding on-sale bar applied in part because the agreement at issue "expressly contemplated" passage of title). In return for practicing the claimed invention, Sensormatic agreed to pay Spin Logic for Phase 1 as follows:

- First Payment: $25k at official start of Phase 1
- Second Payment: $25k at the successful completion Phase I Preliminary Design Review (PDR) requirements. The planned date for the PDR is Thursday, September 3rd, 1998.
- Third Payment: $30k at the successful completion of the Phase 1 demo and approval by Sensormatic VPD Engineering. The planned date for the successful completion of the Phase 1 demo is November 2nd, 1998.

D.I. 111-9, Ex. 9 at 9. A similar payment structure inured to Phase 2:

- First Payment: $25k at official start of Phase 2.
- Second Payment: $25k at the successful completion Phase 2 Preliminary Design Review (PDR) requirements. The planned date for the PDR is February 5, 1999.
- Third Payment: $30k at the successful completion of the Phase 2 demo and approval by Sensormatic VPD Engineering. The planned

>> date for the successful completion of the Phase 2 demo is March 26, 1999.

D.I. 111-9, Ex. 9 at 13; *Id.* at 12 § 6.0, 17 § 6.0 ("The subcontractor shall receive remuneration for services rendered.").

Thus, the plain text of the Phase 1 and 2 Agreements contain the "essential price, delivery, and payment terms" unambiguously evincing that, before the critical date of March 10, 1999, Mr. Broemmelsiek offered his claimed invention for sale to Sensormatic in exchange for money—a commercial offer for sale under the on-sale bar. *Merck*, 822 F.3d at 1351; *Plumtree*, 473 F.3d at 1163; *Scaltech*, 269 F.3d at 1328-29.

Sensormatic argues that "[e]ven if such tests and demonstrations in fact involved performance of any '652-claimed methods," Sensormatic and Genetec were "development partner[s]" and did not engage in invalidating commercial activity because they were focused on "pre-commercialization" activities. *See* D.I. 167 at 14-15; D.I. 127 at 26 ("Pre-commercialization activities aimed at making an invention commercial, even if accompanied by payment, do not themselves implicate the on-sale bar.").

While "[i]t is well-settled that mere preparations for commercial sales are not themselves 'commercial sales' or 'commercial offers for sale' under the on-sale bar," *Medicines*, 827 F.3d at 1377, Spin Logic was paid by Sensormatic to practice the claimed invention, rendering Sensormatic's cited authority inapposite. D.I. 127 at 26. Unlike in *Medicines*, where the patentee hired a manufacturer to reduce the invention to practice and build inventory ahead of the patentee's future commercialization,[5] here, Spin Logic did not hire Sensormatic to build inventory or

---

[5] *See Medicines*, 827 F.3d at 1377-79 ("Stockpiling by the purchaser of manufacturing services is not a trigger to the on-sale bar .. Unlike those in cases . . . in which we applied the on-sale bar to the performance of patented methods for commercial gain, [the patentee's] transactions

7

manufacture an apparatus for Spin Logic's future commercialization; rather Sensormatic hired Spin Logic after Spin Logic offered to perform the claimed invention in exchange for "renumeration." D.I. 111-9, Ex. 9 at 12, 17. *See BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 969 (Fed. Cir. 2020) ("[P]erforming the process itself for consideration is sufficient to trigger the on-sale bar.").

Relatedly, unlike in *In re Kollar* and *BASF*, which "rest[] on the well-established principle that the grant of a license to practice a patented invention, with or without accompanying technical information, does not itself create an on-sale bar," *BASF*, 955 F.3d at 969-70 (citing *In re Kollar*, 286 F.3d 1326, 1333 (Fed. Cir. 2002)), Spin Logic did not provide Sensormatic with a license so that Sensormatic could practice the claimed invention; again, Spin Logic offered to perform it for Sensormatic. *See* D.I. 111-9, Ex. 9 at 11 & 15 § 3.0 ("The subcontractor shall help design develop, integrate, test, document and demonstrate a technology demonstration based on the integration of proprietary Spin Logic Technology with the Sensormatic SpeedDome [and Ultradome].").

Finally, *Honeywell*, *f'real* and *Trading Technologies* do not compel a different result, especially as the inventions at issue in those cases, unlike here, had not been reduced to practice.[6] *See Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 996-97 (Fed. Cir. 2007) ("[T]he record shows that Honeywell entered into these negotiations [with third parties] to

---

with [a manufacturer] did not involve invalidating sales or offers for sale of the invention. [The patentee] did not market or release its invention to any purchasers by contracting with [the manufacturer], nor did it give [the manufacturer] approval to do so. Rather, [the patentee] made a pre-commercial investment—an outlay of $347,500—when it paid [the manufacturer] for the service of reducing its invention to practice.").

[6] *Honeywell* is further inapposite as the Federal Circuit evaluated whether a commercial relationship between a patentee and certain third-parties was primarily experimental rather than commercial under the experimental use doctrine—a doctrine that, as described *infra*, does not apply in the on-sale bar context after an invention has been reduced to practice.

facilitate its programs to test its new system with human pilots in a genuine cockpit setting . . . Honeywell used computer simulations, test aircraft, and demonstrations to those with expertise in air safety such as pilots to move the invention toward a reduction to practice."); *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, C.A. No. 16-41-CFC, 2019 WL 1716674, at *2 (D. Del. Apr. 17, 2019) (declining to apply on-sale bar because "QuikTrip made it clear that they would only purchase f'real's blenders and place them in QuikTrip's over 500 convenience stores if f'real could *invent* and *build* a self-serve blender.")(emphasis added); *Trading Techs.*, 595 F.3d at 1361 (affirming district court's summary judgment that an "Individual Consulting Agreement" between the inventor and eventual patentee was "not a sales transaction for a product embodying the patented invention": "[The patentee] promised to develop trading software for [the inventor] because [the inventor] lacked the technical expertise to do so. [The consulting agreement] was a contract for providing hourly programming services to [the inventor]—not a computer software license. [The inventor] did not sell or offer for sale anything embodying the invention."). Spin Logic could not have been paid for the service of reducing the claimed invention to practice because, by the time the Phase 1 and 2 Agreements were signed on August 7, 1998 and December 3, 1998, Mr. Broemmelsiek admitted that he already had reduced his inventions to practice. D.I. 111-9, Ex. 9 at 1; *supra* n.4. As a result, Sensormatic's authority do not place the Phase 1 and 2 Agreements beyond the on-sale bar's reach.

Sensormatic disputes that its retention of Spin Logic-created demonstration materials constitutes a sale because "[w]hen the agreements were entered, there was no binding obligation or guarantee that these demonstration materials would embody *any of the claimed inventions*. There was only a *hope* that they would, *if* Broemmelsiek succeeded." D.I. 199 at 15. However, Sensormatic cites no authority holding that a commercial offer for sale requires the patentee to

actually build a claimed apparatus. Instead, courts have adopted the contrary principle that "[a]n *offer* to sell is sufficient to raise the on-sale bar, regardless of whether that sale is ever consummated." *See Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 726 F.3d 1370, 1374– 76 (Fed. Cir. 2013) (explaining that on-sale bar applies to commercial offer regardless of whether parties execute a binding contract) (emphasis added). It is enough that Spin Logic offered to practice the claimed invention by "demonstrat[ing] both [sic] the Phase 1 system as specified in Section 4.2 of this document" and agreed that "demonstration hardware and software/firmware shall be retained by Sensormatic." D.I. 111-9, Ex. 9 at 12 § 5.0; *id.* at 15 § 5.0; *see Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1370 (Fed. Cir. 2007) ("[E]vidence of an offer to sell is sufficient to trigger the on-sale bar under 35 U.S.C. § 102(b). There is no requirement that the sale be completed."); *see also Quest Integrity USA, LLC v. Cokebusters USA Inc.*, 924 F.3d 1220, 1227 (Fed. Cir. 2019).

Finally, while Sensormatic argues that "[t]he parties' hopes for future commercial success do not convert the development and testing activities described in the Phase 1 and Phase 2 agreements into invalidating commercial exploitation," D.I. 167 at 15, "expressing a desire to do business in the future does not negate the commercial character of the transaction then under discussion." *Cargill*, 476 F.3d at 1370.

The Phase 1 and 2 Agreements constitute commercial offers for sale within the meaning of the on-sale bar.

### 2. The Phase 1 and 2 Agreements Are Not Negated By Experimental Use

Sensormatic argues that the Phase 1 and 2 Agreements "concerned pre-commercial development activity undertaken primarily for purpose of experimentation." D.I. 127 at 27.[7]

While "[t]he law has long recognized a distinction between experimental usage and commercial exploitation of an invention," *Atlanta Attachment*, 516 F.3d at 1365, "experimental use cannot occur after a reduction to practice." *Cygnus*, 536 F.3d at 1356 (citations omitted). *See also, e.g., Allen*, 299 F.3d at 1354; *Cont'l Plastic Containers v. Owens Brockway Plastic Prods., Inc.*, 141 F.3d 1073, 1079 (Fed. Cir. 1998) ("The policy behind experimental use negation is to give the inventor an opportunity to reduce the invention to practice"); *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1061 (Fed. Cir. 1989) ("Also, under our precedent, experimental use, which means perfecting or completing an invention to the point of determining that it will work for its

---

[7] It appears that by conflating "developing" and "testing", on the one hand, with "experimental use", on the other, Sensormatic has confused *Pfaff's* application. *See* D.I. 127 at 27 ("The undisputed evidence shows that Mr. Broemmelsiek's primary purpose in entering the 1998 Agreements was the non-commercial or pre-commercial purpose of developing and testing whether his inventions would work for their intended purposes and to test their features."); *Id.* at 29-30 ("[T]he 1998 Agreements were clearly for the non-sale purposes of development and testing Mr. Broemmelsiek's inventions. Any 'commercial' aspects, including compensation to Spin Logic/Mr. Broemmelsiek, was incidental to that experimental purpose."). In *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, the Federal Circuit recently explained that asking the Court to consider "whether the invention was under development, subject to testing, or otherwise still in its experimental stage at the time of the asserted sale . . . is not the question *Pfaff* prong 1 asks." 32 F.4th 1161, 1172 (Fed. Cir. 2022) (citing *Allen*, 299 F.3d at 1354) (internal quotation marks omitted). "Instead, it is whether the primary purpose of the inventor at the time of the sale, as determined from an objective evaluation of the facts surrounding the transaction, was to conduct experimentation." *Id.* (citing *Allen*, 299 F.3d at 1354) (internal quotation marks omitted). The Federal Circuit further explained: "Although we have recogniz[ed] an overlap of the experimental use negation and the prong 2 'ready for patenting standard,' here we think the district court's 'still under development' observation regarding [certain third-party] testing is better considered at prong 2." *Id.* (citing *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379–80 (Fed. Cir. 2005); *EZ Dock, Inc. v. Schafer Sys., Inc.*, 276 F.3d 1347, 1352 (Fed. Cir. 2002)) (internal quotation marks omitted).

11

intended purpose, ends with an actual reduction to practice."); *accord Canada v. Van Well Nursey, Inc.*, C.A. No. 2:20-CV-00181-SAB, 2022 WL 18028270, at *6 (E.D. Wash. Dec. 30, 2022) ("Staccato was reduced to practice before Stemilt's commercial sale of the fruit in 2000. Therefore, there can be no experimental use negation."); *Partsriver, Inc. v. Shopzilla, Inc.*, C.A. No. 09-811 CW, 2009 WL 2591355, at *5 (N.D. Cal. Aug. 21, 2009) ("[B]ecause experimental use cannot preclude the on-sale bar after a reduction to practice and Plaintiff concedes that the invention here was reduced to practice, Plaintiff cannot claim experimental use.");

Mr. Broemmelsiek concedes that the claims of the '652 patent were reduced to practice as of August 7, 1998, *see supra* n.4, so experimental use cannot excuse Sensormatic from the on-sale bar's application.

Nevertheless, Sensormatic maintains that the U.S. Supreme Court's decisions in *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126 (1877) and *Smith & Griggs Mfg. Co. v. Sprague*, 123 U.S. 249, 256 (1887) should govern, rather than "inconsistent Federal Circuit precedent," and make experimental use available even after reduction to practice. Tr. 12:9-10; D.I. 167 at 15-16; D.I. 199 at 14-15. *City of Elizabeth* and *Smith & Griggs*, however, analyzed experimentation under the public use bar, not the on-sale bar. *See City of Elizabeth*, 97 U.S. at 134-35 ("When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case, such use is not a *public use*, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it and improve it, or not. His experiments will reveal the fact whether any and what alterations may be necessary.") (emphasis added); *Smith & Griggs*, 123 U.S. at 250, 256 ("The defenses relied on are . . . that a machine embodying them was in *public use* for more than two years prior to the application for the patents . . . The thing implied as excepted out of the prohibition

12

of the statute is a use which may be properly characterized as substantially for the purposes of experiment.") (emphasis added); *see also Allied Colloids Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1574 (Fed. Cir. 1995) (citing to *City of Elizabeth* and *Smith & Griggs* as public use cases). Indeed, the Federal Circuit has explicitly distinguished between experimentation arising under the Court's "public use" versus "on-sale" authority:

> In *Tone Bros.* this court held that "public use" under section 102(b) could be negated by experimentation directed at optimizing the functional aspects of an article while not addressing the ornamental aspects of its design. *Tone Bros.* is a "public use" case. We see no reason to extend the analysis to the "on-sale" context. "Public use" and "on-sale" bars, while they share the same statutory basis, are grounded on different policy emphases. The primary policy underlying the "public use" case is that of detrimental public reliance, whereas the primary policy underlying an "on-sale" case is that of prohibiting the commercial exploitation of the design beyond the statutorily prescribed time period.

*Cont'l Plastic Containers*, 141 F.3d at 1078–79 (citing *Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 1199-20 (Fed. Cir. 1994)). Accordingly, until the Federal Circuit instructs otherwise, *City of Elizabeth* and *Smith & Griggs* do not provide a basis for Sensormatic to claim, in the on-sale bar context, experimental use negation after reduction to practice.

### B. Defendants' Motion for Summary Judgment of Non-Infringement of the '954 Patent Is Denied.

Genetec argues that summary judgment of noninfringement is required because the "'landing matrices' in which the Accused Products store access rights in data structures are never sent to the elevator controller" as required by, *inter alia*, claim 1 of the '954 patent. D.I. 195 at 12 (emphasis omitted).

Claim 1 recites:

> A security control system for an elevator system, comprising:
>
> an elevator controller that controls access to floors served by one or more elevators;

>an access control system that stores one or more landing matrices that define the access to the floors, the access control system providing the landing matrices to the elevator controller, wherein the access control system includes a landing matrix application programming interface ("API") that accepts landing matrix objects in messages received over a security network, the landing matrix API overriding the landing matrices with the landing matrix objects; and
>
>a security network control system that enables configuration of the landing matrix objects, and sends the landing matrix objects in the messages to the access control system over the security network.

'954 patent at cl. 1. The Court construed "one or more landing matrices that define access to the floors, the access control system providing the landing matrices to the elevator controller" according to its ordinary meaning, which is "data structure(s) provided to an elevator controller that define(s) access to the floors of a building." D.I. 68 at 1, 6. Sensormatic explains Genetec's accused products satisfy this limitation because, in the accused products, ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

14

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ Whether or not data structures are conveyed to the elevator controller is a genuine issue of material fact precluding entry of summary judgment.

While the parties appear to hold differing views on what it means to "provide[]" data structures to an elevator controller, *see* D.I. 167 at 23-26; D.I. 195 at 13-17, neither party requested the Court to separately construe the term "provide" during claim construction, and neither party does so now. "The Court recognizes . . . that '[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.' But that does not mean that every dispute about the proper application of a claim term to an accused product is itself a question of law the Court must resolve. Moreover, the ultimate deadline by which the Court must fulfill its obligation to construe claim terms is when it instructs the jury. Accordingly, should either party here believe it has a good faith basis to ask the Court to resolve additional claim construction disputes (as opposed to, for instance, asking the Court to reconsider a construction dispute it has already resolved), it is free to ask the Court to do so in connection with the preparation of jury instructions." *Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, C.A. No. 15-819-LPS-CJB, 2018 WL 1664971, at *2 (D. Del. Apr. 6, 2018) (quoting *O2Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008)).

### III. CONCLUSION

For the foregoing reasons, the Court grants Genetec's motion for summary judgment on invalidity of the '652 patent due to the on-sale bar, denies as moot Sensormatic's motions related to the '652 patent, and denies Genetec's motion for summary judgment of non-infringement of the '954 patent. The Court will issue an Order consistent with this Memorandum Opinion.